**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**ROY HORTON,**

                **Plaintiff,**

*vs*.                                  **CIVIL ACTION NO. 1:09CV114**


**LT. WESLEY DOBBS, Marion Co.**
**Sheriff's Dept.; OFFICER BENSON,**
**Transportation Officer, Marion Co.**
**Sheriff's Dept.; OFFICER B. KIMBALL,**
**Booking Officer, North Central Regional Jail;**
**GEORGE TRENT, Administrator,**
**North Central Regional Jail, JOHN L. KING,**
**Chief of Operations, West Virginia Regional**
**Jail Authority,**

                **Defendants.**


**REPORT/OPINION RECOMMENDING GRANTING**
**DEFENDANTS BRENDA KIMBALL, GEORGE TRENT, AND JOHN L. KING'S**
**MOTION FOR SUMMARY JUDGMENT**

      This matter is before the undersigned United States Magistrate Judge pursuant to "Defendants' Brenda Kimball, George Trent, and John L. King, II, Motion for Summary Judgment"filed on March 10, 2011[Docket Entry 176]; Plaintiff's "Combined Affidavit for Summary Judgement against Defendant Dobbs and Benson and in Opposition to Defendants' Kimball, Trent and Kings Motion for Summary Judgement Pursuant to Rule 56" filed on April 19, 2011[Docket Entry 202], and Defendants' "Reply to Plaintiff's Combined Affidavit for Summary Judgment Against Defendant Dobbs and Benson and in Opposition to Defendants Kimball, Trent, and Kings' Motion for Summary Judgment Pursuant to Rule 56" filed on May 3, 2011. [Docket Entry 210]. Plaintiff also filed a "Motion to Strike Affidavit Submitted in Bad Faith Pursuant to

Rule 56(g)" on April 14, 2011 [Docket Entry 199], to which Defendants filed a "Response" on April 25, 2011 [Docket Entry 204].[1]  All motions filed in this case were referred to the undersigned United States Magistrate Judge by Order entered October 30, 2009 [Docket Entry 24].

The undersigned finds there are no genuine disputes as to any material fact at issue and the legal issues are dispositive of these defendants' motion, and therefore decides the motion without hearing.

## Statement of Undisputed Facts

Plaintiff Roy Horton was sentenced by this Court in November 1995, on charges of Aiding and Abetting in the Distribution of Cocaine (Count One) and possession of a firearm during a drug transaction (Count Four).  He was sentenced to 120 months imprisonment and 4 years supervised release for Count One, and 60 months imprisonment (to be served consecutive to Count One) for Count Four.  See U.S. v. Horton, 1:93cr40 (N.D.W.Va.).

Plaintiff  was released and supervision commenced on December 22, 2006.  Id.

In June 2007, Plaintiff enrolled in and commenced classes at West Virginia Business College, in the Nationally Accredited Paralegal Program.  Plaintiff's affidavit at paragraph 4.

The Paralegal Program consisted of six (6) quarters to graduate with an Associates Degree in Paralegal Studies.  Id. at paragraph 5.

On February 23, 2008, Plaintiff was arrested by Fairmont City Police Officer Eric Hudson and charged with DUI, Driving on Revoked or Suspended License, No Registration, and No Proof of Insurance in Marion County Magistrate Court,  Case No's. 08-M-288, 289, 290, and 291. Id. at

---

[1]This Report and Recommendation does not address Defendants Dobbs and Benson's separate Motion for Summary Judgment or Plaintiff's Motion for Summary Judgment, which will be entered separately.

paragraph 6.

As a result of the above State arrest, Plaintiff was arrested on charges of violating his Federal Supervised Release on March 4, 2008.  Id. at paragraph 7.

Pursuant to the above arrest, the District Court modified Plaintiff's Conditions of Supervised Release to include residence and completion of inpatient substance abuse treatment through the VA Hospital in Clarksburg, WV.  Plaintiff completed the program on April 22, 2008.  Id. at paragraph 8.

On May 4, 2008, Fairmont Police Officer Hudson again arrested Plaintiff on charges of Driving on Suspended or Revoked License for Previous DUI, in Marion County Magistrate Court, Case No.  08-M-669.

On May 8, 2008, Plaintiff's United States Probation Officer filed a "Petition for Warrant or Summons for Offender Under Supervision," alleging that Plaintiff violated a mandatory condition of his supervised release requiring that he not commit another federal, state or local crime, and that he also violated the Standard Condition requiring him to notify his probation officer within 72 hours of being arrested or questioned by a law enforcement officer.  See U.S. v. Horton, 1:93cr40, at Docket Entry 167.  In support of the allegations, the Petition states that on Sunday, May 4, 2008, at 10:45 a.m., Plaintiff was arrested by the Fairmont Police Department and charged with "Driving on a Suspended License for a Previous DUI Conviction."  The petition recommended modifying Plaintiff's Federal supervised release to include three (3) months of community confinement at Bannum Place in Clarksburg, West Virginia.  A summons was issued for Plaintiff to appear before the undersigned United States Magistrate Judge for a preliminary hearing on May 28, 2008.  Id.

On May 9, 2008, Plaintiff appeared with counsel Keith Cox, before Marion County

Magistrate Melissa Pride-Linger and entered a guilty plea to two (2) counts of Driving While License Revoked or Suspended for DUI, Second Offense in Cases 08-M-289 and 669. Plaintiff's affidavit at paragraph 11. Plaintiff was sentenced to twelve (12) months incarceration, which Magistrate Pride-Linger suspended, instead ordering him to Home Incarceration with electronic monitoring for a period of twelve (12) months beginning on June 9, 2008. Id. at paragraph 12.

On May 28, 2008, Plaintiff appeared before the undersigned United States Magistrate Judge for preliminary hearing on the petition for violation of Federal Supervised Release. The Court heard the testimony of Plaintiff's supervising United States Probation Officer John Burlas, who had filed the Petition. Officer Burlas advised that Plaintiff had pled guilty to the State offense of Driving on a Suspended License, as well as the underlying offense of Driving Under the Influence. U.S. v. Horton, 1:93cr40.

The undersigned United States Magistrate Judge found there was probable cause that Plaintiff had violated his conditions of supervised release. U.S. v. Horton, 1:93cr40.

Officer Burlas advised that the State court had sentenced Plaintiff to one year of home confinement with electronic monitoring, to begin on June 10, 2008. U.S. v. Horton, 1:93cr40.

In light of the State sentence, Officer Burlas changed his recommendation from placement at Bannum Place to a recommendation that final hearing on the current Petition be held in abeyance until the Defendant "successfully completed" his one year of State home confinement on electronic monitoring. The undersigned United States Magistrate Judge agreed and recommended to the District Judge that the final hearing on the Petition be held in abeyance until Plaintiff "successfully completed" his State sentence of one year of home confinement on electronic monitoring. Plaintiff and his counsel agreed to this recommendation as an appropriate disposition of the Petition. U.S.

v. Horton, 1:93cr40.

United States District Judge Irene M. Keeley agreed with the recommendation in an Order entered June 13, 2008, holding the Petition in abeyance until Plaintiff successfully completed his year of home confinement on electronic monitoring to begin June 10, 2008. In her Order, she expressly stated:

> During that year, were Horton to violate any condition of his home confinement or supervised release, then Officer Burlas would recommend that Horton go straight to a final hearing without another preliminary hearing in this matter . . . . should Horton fail to comply with either the terms of his home confinement or the terms of his supervised release, the Court will conduct a final revocation hearing in this matter.

U.S. v. Horton, 1:93cr40.

On June 7, 2008, Fairmont Police Officer Hudson arrested Plaintiff on a charge of Permitting Unauthorized Driver and Permitting DUI 2nd in Marion County Magistrate Court, Case No. 08-M-871, 872. Plaintiff's affidavit at 20.

Plaintiff was transported to the North Central Regional Jail and committed and imprisoned on the Criminal Complaint of Officer Hudson pending appearance before a State magistrate. Plaintiff's affidavit at 21.

That same day, Marion County Magistrate Pride-Linger conducted an initial appearance via video, advising Plaintiff of his rights and setting bail on each charge at $5,000.00 cash/surety. Plaintiff's Exhibit AB-2.

Plaintiff was committed to the North Central Regional Jail pending posting of bail. Plaintiff's Ex. AB-3.

On June 9, 2008, Plaintiff posted bail and was released by Marion County Magistrate Peggy Twyman. Plaintiff's Ex AB-4.

On June 9, 2008, Plaintiff presented to Defendant Lt. Wesley Dobbs, Home Incarceration Supervisor for Marion County and an employee of the Marion County Sheriff's Department. Plaintiff's affidavit at 26.

Defendant Dobbs and Plaintiff discussed Plaintiff's attendance at school and Plaintiff's medical condition. Defendant Dobbs approved Plaintiff's being outside his residence from 6:00 a.m. though 6:15 p.m. in order to attend school and school-related activities. He also permitted Plaintiff to be outside the residence from 7:00 p.m. until 9:00 p.m. to attend AA and NA meetings. Plaintiff's affidavit at 31 and 32.

Defendant Dobbs provided Plaintiff with four pages of documents. The first is "Equipment Rules" (regarding the use and requirements of the electronic monitoring system); the second and third pages were an "Agreement to Comply with Rules;" and the Fourth page is entitled "Waiver of all Fourth Amendment Rights." Plaintiff's affidavit and Exhibits.

Plaintiff claims he explained to Dobbs that he did not have his reading glasses and could not read the above documents. He claims Dobbs read or explained the documents to him. He claims Dobbs referred to the "Waiver of all Fourth Amendment Rights" form as a "Consent to Search" form. Plaintiff asked Dobbs if he was required to sign the Consent to search form, and Dobbs advised that signing was not only standard practice for home incarceration participants, but also that if he refused to sign Lt. Dobbs would commit him to the North Central Regional Jail until he either signed or served the original 12-month sentence. Plaintiff's affidavit at 40.

Dobbs admits signing all the forms. He claims he signed the "Waiver of all Fourth Amendment Rights" form against his will in order to stay out of jail, to continue attending school, and to continue receiving medical care. He claims he was not provided a copy of the documents.

He claims that "but for" Dobbs' misrepresentation of the facts, he would not have signed "what he now knows to be a Waiver of all Fourth Amendment rights, under any circumstances." Plaintiff's affidavit at 42. Nevertheless, he did sign the forms and there is no indication anywhere in the record that Plaintiff signed under protest or coercion.

On June 13, 2008, Attorney Conrad Gall was appointed to represent Plaintiff on the charges of Permitting Unauthorized Driver and Permitting DUI 2nd, cases 08-M-871 and 872. Plaintiff's affidavit at 43.

On June 16, 2008, United States Probation Officer Burlas filed a subsequent Petition advising that on June 7, 2008, Plaintiff was arrested by the Fairmont Police Department for the offenses of Knowingly Permitting an Unlicenced and Intoxicated Person to Operate his vehicle. (Magistrate court cases 08M-871 and 872.). Officer Burlas advised the Court that Plaintiff had been arrested and received by the North Central Regional Jail on June 7, 2008, and released on June 9, 2008. Plaintiff had promptly notified Officer Burlas of this arrest. Further, Plaintiff denied knowing the driver of his vehicle had no licence or that he was intoxicated, and planned to pursue the matter to trial. Officer Burlas therefore recommended no further action regarding the Federal Supervised Release until the pending state charges were resolved. United States District Judge Keeley agreed with this recommendation. U.S. v. Horton, 1:93cr40.

On June 23, 2008, Attorney Gall filed a Motion for Jury Trial on the June 7, 2008, State charges of Permitting Unauthorized Driver and Permitting DUI 2nd in Marion County Magistrate Court, Case Nos. 08-M-871, 872. Plaintiff's affidavit at 45, Ex. AB-7.

On July 25, 2008, Fairmont Police Officer Glen Staley arrested Plaintiff for DUI. Plaintiff's

affidavit at 46.[2]  Officer Staley's incident report states that he saw two vehicles stopped after an accident.  He asked who was driving Plaintiff said he was not driving, but the other man in Plaintiff's car and the driver of the other car both said Plaintiff was the driver.  Officer Staley detected a strong odor of alcohol and performed a field sobriety test which Plaintiff failed.  He then administered a preliminary and Breathalyzer test, with results of .135%.  Officer Staley arrested Plaintiff for DUI, transported Plaintiff to the Fairmont Police Department at approximately 8:30 p.m., and processed him. Officer Staley released him on bond at 9:50 p.m. "due to the amount of calls on the shift." Plaintiff's Ex A-7.

Officer Staley did not charge Plaintiff with a criminal offense on July 25, 2008, nor did he issue a Citation to appear in court fo DUI.  Plaintiff's affidavit at 48, Ex. 7(a).[3]

On July 28, 2008, the Marion County Prosecutor moved to have Plaintiff's bond revoked due to the June 7th violation of Permitting Unauthorized Driver and Permitting DUI 2nd in Marion County Magistrate Court, case no 08-M-871, 872.  Plaintiff's affidavit at Ex. AB-8.

On July 28, 2008, Plaintiff's United States Probation Officer Burlas made an entry in his log stating that he had made contact with the Marion County Home Confinement office, which confirmed Plaintiff's arrest on July 25.  It was reported that Plaintiff had been away from his

---

[2]Plaintiff alleges that Officer Staley did not have probable cause to arrest him "when he was not privy to me allegelly [sic] operating a motor vehicle under the influence of alcohol." Plaintiff's affidavit. Officer Staley is not a party to this action and the undersigned finds this "fact" is not relevant to this motion.

[3]Plaintiff alleges "to the very best of his knowledge and belief," that Officer Staley arrested him without probable cause in order to get his blood alcohol level and to keep him outside his residence without prior approval to cause a violation of his Home Incarceration and Federal Supervised Release.  Plaintiff's affidavit at 49.  There being no allegations against Officer Staley, the undersigned finds Plaintiff's belief as to his motive is not relevant to Plaintiff's complaint.

residence from 8:21 to 9:52, and the accident happened at 8:25. Plaintiff's home confinement officer was out of town, but the office employee was going to "go ahead and type up order for revocation and officer would sign when he returned." Plaintiff's Ex A-18.

On July 30, 2008, Home Confinement Officer Dobbs filed a Petition in Marion County Magistrate Court for an Order or Warrant for Plaintiff's arrest for being outside his approved residence, and consuming alcoholic beverages. The Petition was granted by Marion County Magistrate Peggy Twyman. Plaintiff's affidavit at 53.

On July 30, 2008, Plaintiff left a voice mail with Probation Officer Burlas, stating that the State violated him on the charges from the arrest on July 25, and he was to self-report by 2pm. Id.

On July 31, 2008, Lt. Dobbs arrested Plaintiff on the alleged home confinement violations of July 25. Plaintiff's Ex. A-8.

Plaintiff appeared before Magistrate Twyman who arraigned him. Plaintiff stated he wanted attorney Keith Cox appointed for him. Attorney Cox was not available, however, and Magistrate Twyman set bail in the amount of $531.00 and proceeded to hold a preliminary hearing. Plaintiff's affidavit at 58.[4]

Magistrate Twyman advised Plaintiff that a final revocation hearing would be set at a later date, and issued a Jail Commitment Order. Ex. A-9. Dobbs took custody of Plaintiff and escorted him to the Marion County Transport Facility, advising him that he had one hour to post bail or he would have someone transport him to the North Central Regional Jail. Plaintiff's affidavit at 63.

---

[4]Plaintiff alleges Magistrate Twyman heard the exclusive testimony of Dobbs and found probable cause based only on this testimony. He alleges he was not ever asked if he would testify and would not have done so "because I was not represented by counsel." There are no allegations against Magistrate Twyman in the Complaint and this allegation is therefore not relevant to this motion.

Dobbs then advised someone at the transportation facility to allow Plaintiff to use the phone to try to arrange bail. He contacted Rev. John Brown who appeared in court and posted bond. Plaintiff's affidavit at 64 and 65, Exs. A10, 11, 11(a). Magistrate Twyman ordered Plaintiff's release on bail. He had not yet been transported to the North Central Regional Jail.

On August 4, 2008, Plaintiff contacted his USPO John Burlas to report that he made bail on the violation of home confinement case and was home, but stated he was positive his home confinement would be revoked and understood that his federal supervised release would also be revoked. Officer Burlas's notes say Plaintiff "States he could use a break ie...go back to prison."[5] Plaintiff said he would, however, fight the July 25 DUI violation because he was innocent and was not the driver, but would lose because the driver and the witness would both say he was. Plaintiff told Officer Burlas he planned to go to school that week because he got paid to go, "so he will have some monies when he does go back to prison." Officer Burlas instructed Plaintiff to keep him current on his status and whereabouts. Plaintiff's Ex. A-18.

On August 4, 2008, Marion County Magistrate Reed-Vanata granted the State prosecutor's motion to revoke, stating: "Will hear on 8/11/08 at 1:00 p.m."

On August 5, 2008, Lt. Dobbs went to Plaintiff's residence based on a tip either from an informant or, as Plaintiff believes, from another law enforcement officer, that Plaintiff was seen carrying beer. Dobbs entered Plaintiff's residence. Dobbs found Plaintiff behind an open door in the bathroom. Dobbs arrested Defendant. These facts are not in dispute. There is also no dispute that Dobbs had no warrant to search the residence or arrest Plaintiff. [6]

---

[5] Plaintiff denies making this statement to Officer Burlas.

[6] While these facts and the arrest are not disputed, the facts underlying the arrest are very much in dispute. Defendant Dobbs contends that Plaintiff was seen carrying a case of beer, and

Dobbs had Plaintiff transported to the Marion County Sheriff's Transport facility at about 2:45 p.m. Plaintiff's affidavit at 87.

The transport facility is located approximately 200 yards from the Magistrate Courts. Plaintiff's affidavit at 89.

Dobbs did not request a warrant from a Magistrate. Plaintiff's affidavit at 91.

Dobbs did not take or have Plaintiff taken before a Magistrate.

Dobbs signed a "Commitment and Release Form" committing Plaintiff to the North Central Regional Jail for violation of Rules 1, 5, and 10 of his home confinement.

Dobbs did not prepare an incident report regarding the arrest of August 5, 2008.

Defendant Benson is a transportation officer for the Marion County Sheriff's Department. On August 5, 2008, Dobbs gave Benson the Commitment and Release Form to have him transported to and committed to the North Central Regional Jail.

Benson placed Plaintiff in the transport van and transported him at approximately 4:15 pm, to the North Central Regional Jail.

Benson presented the Commitment and Release Order to Defendant Kimball, booking officer at the North Central Regional Jail.

Kimball provided Benson a Booking Data Sheet to partially complete, and then herself completed section 2 stating that Dobbs was the arresting officer. The Booking Data Sheet says the

---

he therefore had reasonable cause to search Plaintiff's residence. He also contends he knocked on the door which was answered by a black female. Finally, he contends that he saw in plain view in Plaintiff's residence bottles of alcohol and beer, a clear violation of his home confinement conditions. Plaintiff, on the other hand, claims he was not carrying beer at all, was alone in his residence which the officer entered without knocking or asking, and that there was no alcohol in the residence. This dispute is not a genuine dispute of material fact in regard to the three defendants addressed in this Report and Recommendation, however.

arresting agency was the Marion County Sheriff's Department; the arresting officer was Wesley Dobbs; the transporting officer was Officer Benson; and the committing jurisdiction was Marion County. Defendants Dobbs and Benson's Exhibit 8.

Kimball also completed and electronically signed a "Booking Summary Report" filling in blanks that stated the Order Details as "offense code" VHCON (violation of home confinement); "Statute" WVCC (West Virginia Criminal Code); "Offense Description" "Violate Home confinement;" "Bail Details" - - - Court Judge Dobbs; "Type" Judge's orders. Ex. 9 to amended complaint.

On August 5, 2008, the Magistrate Court of Marion County sent a Notice to Appear to Plaintiff at his home address notifying him a hearing before Magistrate Pride-Linger on August 13, 2008, regarding the June 7 violation. Plaintiff apparently did not receive this notice as he was committed to the North Central Regional Jail that same date, before the notice was delivered to his residence.

On August 6, 2008, the day after Plaintiff was incarcerated, the Marion County Magistrate Court sent a Transport Order to the North Central Regional Jail, ordering the North Central Regional Jail to transport Plaintiff to the Marion County Magistrate Court on the 11th day of August, 2008 for a hearing in the 08M-871 and 872 cases (the June 7, 2008, arrest on charges of Permitting Unauthorized Driver and Permitting DUI 2nd.) Defendants Dobbs and Benson's Exhibit 14.

On August 10, 2008, Plaintiff's United States Probation Officer John Burlas noted he had made contact with the jail, which advised Plaintiff was received on August 5, brought in by a home confinement officer on a home confinement violation. Plaintiff's Ex A-18.

On August 11, 2008, United States Probation Officer Burlas contacted the Marion County

Home Confinement office and was advised Plaintiff had been arrested and taken into custody on August 5. He was informed that home confinement officers had made a home visit and discovered Plaintiff had been drinking alcohol. Plaintiff's Ex. A-18.

On August 11, 2008, Plaintiff appeared in the Marion County Magistrate Court before Magistrate Reed-Vanata in Case No's. 871 and 872, regarding the June 7, 2008, arrest on charges of Permitting Unauthorized Driver and Permitting DUI 2nd. He had been transported to the Magistrate Court pursuant to the Transport Order sent to the North Central Regional Jail by the Magistrate's office on August 6, 2008, the day after his arrest by the home confinement officer. Plaintiff was represented by Attorney Conrad Gall. Attorney Gall advised Plaintiff the State was offering to drop the charge of permitting an unauthorized driver if he entered a plea of guilty to Permitting DUI, Second. If he did so he would be sentenced to six months to run concurrent with the home confinement sentence.

Plaintiff contends he advised Attorney Gall he wanted to go to trial on those charges.

Plaintiff contends he also explained to Attorney Gall the circumstances of his arrest on August 5, "but did not tell counsel that I was being imprisoneded [sic] illegally because I factually did not know of the illegality of my imprisonment until the following day when I submitted my first Inmate Request to Booking/Mrs. Boatwright." Plaintiff's affidavit at 120.

Plaintiff nonetheless contends Attorney Gall could not intercede into the matter of his August 5, 2008 arrest, even if he had known the circumstances were illegal, because Plaintiff was represented by a different attorney on the earlier charges, "and it would have been a violation of the Code of Ethics for Attorney Gall to represent my interest in 08-M-289, 669, when I was repersented [sic] by Mr. Cox." Plaintiff's affidavit at 121.

Plaintiff and Attorney Gall proceeded to the courtroom and advised that Plaintiff wished to proceed to trial. Plaintiff's affidavit at 122.

Prosecuting Attorney Renee Burger called Defendant Dobbs to testify concerning the revocation of Plaintiff's bond.[7]

Dobbs testified that Plaintiff had been arrested and charged with DUI/1st offense by Officer Staley on July 25, 2008, the reason he petitioned to have his home confinement revoked. Dobbs further testified he had taken Defendant into custody on August 5, 2008, because he had "discovered [him] drinking alcohol." Plaintiff's Ex 7(a), 13, p 9, 10 11, 12.

Magistrate Reed-Vanata advised Plaintiff he had every right to go to trial on the June 7 charges, but "if he insisted on invoking that right she was going to revoke [his] bond based on Defendant Dobbs' testimony and allow [him] to select a jury in November and [he] would go to trial in February of 2009, which was eight months away or [he] could be smart and accept the 6-month sentence to run concurrent with [his] home confinement and have the Permitting Unauthorized Driver dismissed." Plaintiff's affidavit at 125.

Plaintiff contends that "based upon the threat in the conversation with Marion County Magistrate Cathy Reed-Vanata [he] entered a guilty plea to the charge of Permitting DUI 2nd, Case No. 08-M-872."[8], [9]

Magistrate Reed-Vanata sentenced Plaintiff to 6 months to run concurrent with the home confinement sentences imposed on May 9, 2008 (case numbers 08M-289 and 669).

---

[7]Plaintiff contends Patrolman Hudson "had" the prosecuting Attorney call Dobbs .

[8]Magistrate Reed-Vanata is not named as a party in this lawsuit.

[9]Plaintiff was subsequently found guilty of that charge by United States District Judge Irene Keeley.

That same date (August 11, 2008) USPO Burlas contacted the jail and was advised that Plaintiff had been received on August 5, 2008, having been brought in by a Home Confinement officer. Plaintiff's affidavit at 129.

On August 12, 2008, Plaintiff submitted an Inmate Grievance to the Booking Department/Mrs. Boatwright regarding his initial hearing on charges from Marion County for which he was imprisoned. The request was forwarded to the Director of Inmate Services. Ex. 11 to amended complaint.

On August 15, Attorney Cox petitioned to withdraw as counsel due to the close of his office and start of new employment with the prosecutor's office, which petition was granted. Plaintiff's affidavit at 130.

On August 15, the Magistrate Court sent a Notice to Appear before Magistrate Pride-Linger on September 23, to Plaintiff at his home address. The Notice was for the final revocation hearing of Plaintiff's home confinement due to the July 25, arrest. Plaintiff's Ex 12.

That same date, Marion County Magistrate Pride-Linger entered a Transportation Order for Plaintiff to be transported from the North Central Regional Jail for the final revocation hearing. Plaintiff's affidavit at Ex. 14.

On August 19, 2008, Officer Burlas filed a subsequent Petition alleging that on July 25, 2008, while on supervised release, Plaintiff was arrested by the Fairmont Police Department and charged with DUI and Driving on a Suspended License for a previous DUI conviction. Officer Burlas noted the charge alleged Plaintiff's BAC to be .135%. He advised that Plaintiff had been arrested, transported to the Police Station, processed and then released. Further, at the time of the incident, a known convicted felon was a passenger in Plaintiff's vehicle.

Although Plaintiff was released on bond July 25, 2008, the police report advises this was due to the large number of calls at the police station that night. Defendant Dobbs, his home confinement officer, subsequently took him into custody for violation of his home confinement, including the facts of the above arrest, and the fact that Plaintiff had left his residence without permission. He was taken to the North Central Regional Jail on July 30, 2008, and released after posting bond on July 31, 2008.

Officer Burlas further included the charges that form the basis of Plaintiff's present Complaint, stating:

> On August 5, 2008, Mr. Horton was again taken into custody by the Marion County Home Confinement Office after being notified by local law enforcement that Mr. Horton had just been observed walking toward his home with a case of beer. North Central Regional Jail records reflect Mr. Horton was received on August 5, 2008 and, to date, he has not made bond. As of this writing, a final home confinement revocation hearing has not been heard.....

Officer Burlas included the following recommendation:

> Given Mr. Horton's significant history of non-compliant behavior, especially his alcohol consumption, and given that lesser sanctions, including inpatient substance abuse treatment and home confinement, have not deterred him from continuing his non-compliant behavior, it is respectfully recommended that Mr. Horton's term of supervised release be revoked.

U.S. v. Horton, 1:93cr40.

On August 20, 2008, United States District Judge Irene M. Keeley Ordered the issuance of a warrant with Plaintiff to be detained upon arrest. Id. at Docket Entry 173.

An arrest warrant was issued that same date and lodged as a detainer, because Plaintiff was in State custody at the North Central Regional Jail.

On August 29, 2008, Plaintiff submitted a request to the booking department at the jail

concerning the charges on which he was being held and the identity of the committing magistrate. Ex 14 amended complaint.

Mrs. Boatwright informed Plaintiff that his charges were home confinement violations, that Dobbs had signed the paperwork, that there was no bond, and that he also had a federal detainer Plaintiff's affidavit at 138, citing Dobbs' interrogatory responses at 16 and 5.

On September 6, 2008, Plaintiff sent a grievance to Defendant Trent, stating that he had been informed on August 4, 2008, he had been committed to the jail by Dobbs, and that on September 4, Officer Boatwright in booking confirmed that Dobbs signed the commitment papers. He advised Trent that Dobbs was not a judicial official and lacked judicial capacity to commit him to jail and the jail's staff should have never accepted his person for imprisonment without a lawful order signed by a magistrate or circuit court judge. He asked Trent to "secure [his] release immediately." Defendants' exhibit H. Defendant Trent responded as follows:

> You are being held on a Home Confinement Violation signed by the home confinement officer. Also, you are being held on a Detainer from the United States Marshal Service. You will need to take this up with your attorney or the Court. You will be held until we receive a release for you.

On September 12, 2008, Plaintiff wrote to Defendant King, as an appeal from Trent's decision. He advised King that Trent recognized he was being detained in jail by Dobbs for home confinement violations, and stated correctly that Dobbs is a Lt. with the Marion County Sheriff's Department, and not a judicial official. He further stated Dobbs lacked the judicial capacity to detain him without a commitment order signed by a magistrate or judge. He stated that Trent was "fully aware that the commitment signed by Mr. Dobbs is not a lawful order issued/signed by a judicial official," and that Trent had "negligently failed to act when he had a duty to insure that I am not detained without a lawful order of a court to commit." He also stated that Trent breached his duty

by failing to take the necessary steps to secure his release.  He noted the federal detainer was not at issue, and concluded with "I want to be released."  Exhibit I.

On September 22, 2008, King responded to Plaintiff's letter as follows:

It appears that a check of your commitment orders requires the Regional Jail Authority to hold you in our custody until we receive court orders releasing you from our custody or sentencing you.  You also have a US Marshal Service detainer that you must clear up.  Therefore, your appeal is denied.  I suggest that you might want to consider retaining private legal counsel to address this matter in the judicial system.

Ex. J.

On September 23, 2008, Plaintiff appeared before Magistrate Pride-Linger with attorney David Anderson for the final revocation hearing in Cases 289 and 669, based on Dobbs' July 30, 2008, Petition alleging violation of home incarceration on July 25, 2008.  Plaintiff's affidavit at 150.

The State called Officer Hudson, then Dobbs.  Dobbs testified to the content of Officer Staley's incident report and testified that based on that report he requested the warrant for arrest for violation of rules 1 and 5 of the home confinement agreement.  Plaintiff's affidavit at 156.

Regarding the August 5 violation, Dobbs testified an informant had seen Plaintiff walking with a case of beer.  Dobbs testified when he arrived at Plaintiff's residence an unknown black female let him in.  Dobbs testified that Plaintiff was found in the bathroom, and he saw a bottle of vodka and two bottles of beer on a living room table.  Dobbs testified he committed Plaintiff to the North Central Regional Jail on August 5, 2008.  Plaintiff's affidavit at 160.

Plaintiff testified he was not charged for the DUI/1st offense on July 25, 2008, nor did Officer Staley issue a citation for DUI.  Ex. 7(a).  Plaintiff testified he had been imprisoned in the jail since August 5, 2008, when Dobbs did not request an order or warrant, without an appearance before a magistrate and Dobbs committed him to the jail without lawful authority to do so.

Plaintiff alleges Magistrate Pride-Linger checked her computer for arraignments on August 5, 2008 or thereafter, which would show he had not been seen by any of the magistrates after that date.

Plaintiff alleges Magistrate Pride-Linger then asked the booking dept at the jail to fax the commitment order to her. Ex. 7, amended complaint.

Plaintiff claims Magistrate Pride-Linger then threw the Commitment and Release Form across the room and dismissed the alleged violation of home confinement as alleged by Dobbs and ordered his release from the jail. Plaintiff's affidavit at 166.

On September 24, supervising United States Probation Officer Burlas received a call from Dobbs, reporting Plaintiff had had a hearing the day before and "he has served his time for violation in Marion County." Officer Burlas advised there was a detainer lodged against Plaintiff and the jail would need to contact the United States Marshal Service to serve it.

On September 24, 2008, Plaintiff appeared in Federal Court via video from the North Central Regional Jail for an Initial Appearance on the August 19, 2008, Petition. Plaintiff requested release pending further proceedings, I order to go to school. That request was denied by the presiding Federal Magistrate Judge. A Preliminary Hearing was originally scheduled for September 29, 2008, but later canceled upon review of the Order by the District Judge expressly ordering Plaintiff proceed straight to a final revocation hearing should he violate his home confinement or his supervised release conditions again. Final hearing was scheduled for October 22, 2008 (Docket Entry 182), but was later continued without objection until October 28, 2008 (Docket Entry 184). The hearing was again continued without objection until November 12, 2008 (Docket Entry 187).

On September 25, 2008, West Virginia Business College officially withdrew Plaintiff's

enrollment due to non-attendance and he forfeited the total sum of $2804 in Title IV loans he had to repay for the summer quarter.

On September 30, 2008, Plaintiff filed a grievance appeal to Terry Miller, Executive Director West Virginia Regional Jail and Correctional Facility Authority "because Defendant King's response of September 22, 208, was a duplicate of Defendant Trent's response of September 8, 2008." Ex. 22 amended complaint.

On November 17, 2008, Plaintiff appeared before United States District Judge Keeley for final revocation on the Petition filed on May 8, 2008, which final revocation hearing had been held in abeyance pending his "successful completion" of his year of home confinement. Plaintiff admitted guilt to the violations of mandatory conditions for the arrests on May 4, and June 7, and Judge Keeley found Plaintiff guilty of violating Standard Condition 7 and 9, excessive use of alcohol and associating with a convicted felon, from the arrest on July 25. District Judge Keeley revoked Plaintiff's supervised release and sentenced him to 14 months imprisonment with credit for time served from September 23, 2008 (Docket Entry 190).[10]

Plaintiff was released from federal custody on his revocation sentence on July 7, 2009. (U.S. v. Horton, 1:93cr40 Docket Entry 201.

### Defendants Kimball, Trent, and King

### Allegations in the Complaint/Amended Complaint

Plaintiff states his amended complaint against the above-named defendants is pursuant to 42 U.S.C. sections 1983 and 1985, "to redress the deprivation, under Color of Law (State Law) of rights

---

[10]Plaintiff argues that had Defendant Trent released him to the detainer, he would have received credit for time served from August 19, 2008 instead of September 23, 2008 (a total of approximately 35 days). There is no dispute his actual federal sentence would have remained the same, except he would have received credit for the time served.

secured by the Constitution of the United States." Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. sections 2201 and 2202.

## Official Capacity or Individual Capacity

Plaintiff's complaint expressly states that each of the three above-named defendants are sued in their individual capacities. In his deposition, however, he testified that all of the actions taken or not taken by the defendants were in their role and capacity of employment at the North Central Regional Jail, and that none was done outside the scope of their employment. Regarding this issue, Plaintiff was asked:

Q:      You would agree with me that Officer Kimball, or the person that you've identified as Officer Kimball, your interaction with them was in their role and capacity of employee [] at the North Central Regional Jail - -

A:      Yes.

Q:      And you would agree with me that it wasn't done outside of the scope of their employment, correct?

A:      Yes.

Q:      Okay. And is it fair to say that that would be the same for George Trent?

A:      And John King.

Q:      So they all would have been - - their interaction or whatever you want to refer to what their interaction with you was in this case and even with each other was within the scope and courts of their employment?

A:      Yeah, within their official capacity.

(Defendant's Exhibit F at 117-118).

The Eleventh Amendment guarantees the immunity of states from suit in the federal courts. It is not overridden by 42 U.S.C. section 1983. State agencies found to partake of the state's Eleventh Amendment immunity include departments of correction. A suit against a state official sued in his official capacity is in reality a suit against the state, and therefore a state official sued in his official capacity enjoys Eleventh Amendment immunity against suit. Further, the Eleventh Amendment prohibits the recovery of monetary damages from state officials sued in their official capacities, yet Plaintiff demands $2,000,000.00 from the defendants in this suit and $3,000,000.00 in punitive damages. Id.

Therefore if Plaintiff actually meant to sue these defendants, all employees of the State, in their official capacities, his money damages demands are barred by the Eleventh Amendment. Plaintiff has also asked for this Court to issue declaratory judgment, which is not barred by the Eleventh Amendment. The Court needn't address the issue, further, however, because Plaintiff expressly indicates in his complaint that Defendants are being sued in their individual capacities. Moreover, in his Motion for Summary Judgment against the two other defendants, Dobbs and Benson, Plaintiff reiterates that the defendants are all being sued in their individual capacities.

## Kimball

Defendant Kimball is and was at the time at issue a booking clerk at the North Central Regional Jail. (Defendant's Ex. A). Defendant Kimball is named individually in the Third Cause of Action which alleges that she accepted the "False and Fraudulent Commitment and Release Form" signed by Lt. Dobbs from defendant Benson, and that she knew or reasonably should have known that: (1) Lt. Dobbs was not authorized by law to commit or release person(s) to or from the North Central Regional Jail; (2) the Commitment and Release Form was not a document fair on its face,

that is process issued by a court, magistrate or body having legal authority to issue proper commitment order; (3) the Commitment and Release Form fairly apprised defendant Kimball that it was issued without authority; however, defendant Kimball intentionally falsely imprisoned Plaintiff in the North Central Regional Jail on authority of the False and Fraudulent Commitment and Release Form signed by Lt. Dobbs when defendant Kimball knew or reasonably should have known that there existed no lawful right to imprison Plaintiff on authority of Lt. Dobbs on August 5, 2008.

When asked if Kimball did something to him intentionally to harm him, Plaintiff responded, "Well, she done it willfully; she accepted it."  When asked if she committed him and kept him locked up, he said that  he could not say she kept him locked up.  She processed him in.  He then stated:

> And as a booking clerk, they are supposed to be properly trained in what is and is not a lawful order of commitment.  And, as I say, that is not a lawful order of commitment.

One significant problem with the complaint as against Kimball is that Plaintiff described her as a tall woman with black and grey hair and glasses, while there is no dispute that Brenda Kimball is 5'3, has brown hair and does not wear glasses (Exhibit A at 4).  Further, Plaintiff does not dispute Ms. Kimball's sworn statement that she never met, communicated or interacted with Plaintiff.  There is no dispute, however, that Ms. Kimball did receive and review the documents provided by Officer Benson and entered the information contained therein into Plaintiff's file.  (Exhibit A at 8).

### Trent

Defendant Trent is, and was at the time at issue, the administrator of the North Central Regional Jail (Defendant's Ex. K).  He is named individually in the Fourth Cause of Action as

follows:

> [O]n August 5, 2008, when defendant Kimball accepted the False and Fraudulent Commitment and Release Form from defendant Benson, defendant Trent learned that Plaintiff was being imprisoned in the North Central Regional Jail, and defendant Trent knew or reasonably should have known that (1) Lt. Dobbs was not authorized by law to commit or release person(s) to or from the North Central Regional Jail, (2) the Commitment and Release Form was not a document fair on its face, that is process issued by a court, magistrate or body having legal authority to issue a proper commitment order, (3) the Commitment and Release Form when fairly viewed established that it was issued without authority, (4) he had no lawful right to continue Plaintiff's imprisonment in the North Central Regional Jail without proper presentment before a judicial official and issuance of a proper commitment order; however, Defendant Trent willfully, intentionally, knowingly, deliberately and with malice in fact, did violate Plaintiff's Fourth and Fourteenth Amendment rights when defendant Trent continued to falsely imprison Plaintiff in the North Central Regional Jail on authority of the False and Fraudulent Commitment and Release Form signed by Lt. Wesley Dobbs when he knew or reasonably should have known that he had no lawful right to do so between August 5, 2008, until Plaintiff released by the court on September 23, 2008.

### Kimball, Trent, and King

In the Fifth Cause of Action, Plaintiff names Kimball and Trent, and pursuant to the amended complaint, King (along with co-defendants Dobbs and Benson), alleging a conspiracy among all the defendants knowingly, intentionally, willfully, wantonly, and recklessly, to combine, conspire, confederate and agree together with others known and unknown to Plaintiff to violate Plaintiff's rights and privileges guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution . . . . all in violation of 42 U.S.C. sections 1983 and 1985(3).

Plaintiff demands Declaratory Judgment, Compensatory damages of $2,000,000.00 jointly and severally against all defendants; and $3,000,000.00 against each defendant for punitive damages.

### Summary Judgment

Defendants Kimball, Trent, and King have moved for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, which provides as follows:

(a)  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion . . . .

(c)(1) A party asserting that a fact cannot be or is genuinely  disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. . . . .

(3) The court need consider only the cited materials, but it may consider other materials in the record.

(4) An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. . . . .

(e) If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of facts as required by Rule 56(c), the court may:

> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed - - show that the movant is entitled to it; or
> (4) issue any other appropriate order.

The party seeking summary judgment bears the initial burden of showing the absence of any

genuine [disputes] of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  "The burden

then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The United States Supreme Court noted in Anderson, however, held: "Rule 56(c) provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979))(Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.") (Citing Stevens v. Howard D. Johnsons Co., 181 F.2d 390 (4th Cir. 1950)).

In Celotex, the Court stated that "the plain language of Rule 56(e) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary Judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 912 F.2d 73 (4th Cir. 1990), cert. denied, 502 US. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The complaint in this case was filed in 2009, and there has been more than sufficient opportunity for discovery despite Plaintiff's pro se status and the fact that he was in federal custody until very recently. The Court granted a number of extensions for him to obtain discovery and file motions and responses.

This Court has carefully reviewed the parties' motions and related memoranda. The Court must take the facts alleged in the Complaint and Amended Complaint as true. See S.P. v. City of Takoma Park, 134 F.3d 260 (4th Cir. 1998). Further, because the plaintiff is pro se, this Court must liberally construed the plaintiff's pleadings. See Haines v. Kerner, 404 U.S. 519 (1971)(holding pro se complaint to less stringent standards than formal pleadings drafted by lawyers).[11]

### W.Va. Code section 62-6-6a

West Virginia Code section 62-6-6a (2011) provides as follows:

(a) It is the duty of all officers of the state, or of any county or municipality thereof, or jailers having the charge and custody of any jail or place of detention, to receive any prisoners arrested by any officer or member of any law-enforcement office acting in his or her official capacity and to detain them in custody until ordered released by a tribunal of competent jurisdiction, and any officer, jailer or person having custody of any jail or place of detention who willfully fails or refuses to receive and detain the prisoner is guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than twenty-five dollars nor more than two hundred dollars, or imprisoned in the county or regional jail for not more than sixty days, or both fined and imprisoned.

A plain reading of this statute indicates a clear duty on the part of the defendants to receive and detain Plaintiff at the North Central Regional Jail, as he was "arrested by any officer or member of any law-enforcement office acting in his official capacity." Further, it was their duty to detain

---

[11]Despite proceeding pro se, the undersigned feels compelled to note that Plaintiff has done an admirable job presenting his case, and except for his incarceration limiting his access at times, appears to have had no real disadvantage in prosecuting his case. He has also proceeded with proper decorum and respect for the procedures and the Court.

Plaintiff until ordered released by a tribunal of competent jurisdiction. Finally, had they not received and detained him, they themselves would have been guilty of a misdemeanor. The sole exception is for a prisoner who appears to be "in need of medical attention of a degree necessitating treatment by a physician," a claim which is not made by Plaintiff.

Besides the Statute itself directing that the jail receive and detain Plaintiff until ordered released by a tribunal of competent jurisdiction, Magistrate Linger's affidavit also states, under oath, that: 1) "It is the responsibility of the North Central Regional Jail to detain an individual until it receives an order releasing the individual which must be signed by a judicial officer;" 2) "The North Central Regional Jail did not have the responsibility of setting a hearing form Mr. Horton. Rather, it was and is the responsibility of the Magistrate Court or the Circuit Court to set a time for hearings;" 3) "If a Defendant has appointed counsel, it is counsel's duty to seek release of the Defendant;" and 4) "It is not the responsibility of the North Central Regional jail to seek the release of an individual from its facilities." (Defendants' Ex. D).

## Qualified Immunity

The Fourth Circuit holds:

> Qualified immunity is an accommodation by the courts to the conflicting concerns of, on one hand, government officials seeking freedom from personal monetary liability and harassing litigation and, on the other hand, injured persons seeking redress for the abuse of official power. *Hodge v. Jones*, 31 F.3d 157 162 (4th Cir. 1994)(internal quotation marks omitted). To that end, qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 296 (1982). In determining whether a government official is entitled to qualified immunity, "we must (1) identify the constitutional right violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable offic[ial] would have understood that the conduct at issue violated the clearly established right." *S.P. [v. City of Takoma Park]*, 134

F.3d at 265 [4th Cir. 1998].

Henderson v. Simms, et al., 223 F.3d 267 (4th Cir. 2000).  Interestingly, Henderson involved as defendants the  Secretary of the Maryland Department of Public Safety and Correctional Services, the Commissioner of the Maryland Division of Correction, and the Warden of the Maryland Reception, Diagnostic and Classification Center, all prison administrators or employees, as in this motion.  The plaintiffs were three individuals who had apparently served their respective criminal sentences and were released from incarceration on "mandatory supervision," a release status similar to parole.  In 1998, three years after one of the prisoners was released (and two and one years, respectively, after the others were released), the Maryland Court of Appeals decided a case involving the interpretation of the statutes governing calculation of sentences.  The three defendants in the civil case, none of whom were judicial officers, interpreted the case themselves and recalculated the three former prisoners' sentences themselves, ordering their release dates recalculated, which then fell far into the future.   The jail administrators  then, without judicial action or warrant, arrested and reincarcerated the three plaintiffs.  Because there was no statute to use to issue warrants under those circumstances, the Warden (not a judicial officer) himself  issued warrants entitled "Retake Warrant for Arrest and Detention of Escaped Prisoner," despite having actual knowledge none of the prisoners had, in fact, escaped, were released lawfully, and had, themselves, done nothing wrong. The warden  then directed and caused armed police officers to arrest each plaintiff at his home or place or work and had them incarcerated.  They were not afforded a hearing either pre-arrest or post-arrest to challenge the basis or legitimacy of their arrests or incarceration.  Each filed a writ of habeas corpus and each was released, the Court of Appeals of Maryland finding that the three jail administrators had misinterpreted the case upon which they relied to arrest the plaintiffs.  In other

words, the Court found the jail administrators were totally wrong in their interpretation of the case, were totally wrong in arresting the plaintiffs, and were totally wrong in incarcerating them on those warrants. The plaintiffs had wrongfully been incarcerated up to 19 days each.

As does Plaintiff here, the Henderson plaintiffs filed suit under section 1983 for damages, alleging their Fourth and Fourteenth Amendment rights were violated by their arrest and detention without probable cause and without a hearing. The district court granted the jail administrators' motions to dismiss based on qualified immunity.

On appeal, the Fourth Circuit found the appellants had been "seized" within the meaning of the Fourth Amendment when arrested. The Court then cited a 1926 Maryland case, in which a prisoner became ill and was released for treatment at a sanatorium. When he then refused to return to jail, the Court held that "where a prisoner secures his liberty through some illegal or void order, it is to be treated as an escape, and he can be retaken and compelled to serve out his sentence." See Hopkins v. North, 151 Md. 553 (1926). Despite the fact that Hopkins had refused to return to prison and the Henderson plaintiffs did not even know they were supposed to be in prison, the Fourth Circuit held that the 74-year-old Hopkins case supported the position that no violation of the appellants' Fourth Amendment rights occurred when they were arrested and re-incarcerated as escapees. This despite the undisputed fact that the appellees were well aware that the plaintiffs had not escaped, had not done anything illegal, and in fact, the appellees had misinterpreted the case law.

More significantly, the Fourth Circuit held that, even assuming that the arrest of the former inmates did violate their Fourth Amendment rights, the court was "convinced" that the rights were not clearly established at the time of the seizures. Certainly the right to be arrested only on probable cause was clearly established at the time. See Smith v. Reddy, 101 F.3d 351 (4th Cir. 1996);

however: "If the test of clearly established law is applied at this level of generality, however, plaintiff alleging a Fourth Amendment violation could 'convert the rule of qualified immunity . . . into a rule of virtually unqualified liability.'" Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Fourth Circuit held that the appellants must therefore allege facts "demonstrating that the established contours of probable cause were sufficiently clear at the time of the seizure such that the unlawfulness of [Appellees'] actions would have been apparent to reasonable offic[ials]." In other words, the appropriate question is whether a reasonable official could have believed that issuing escapee retake warrants pursuant to the Maryland retake-warrant statute for the arrests and reincarceration of individuals erroneously released on mandatory supervision was lawful, in light of clearly established law and the information Appellees possessed. Id. at 273.

The Fourth Circuit then held:

Applying these principles to this case, it was clearly not unreasonable for a Maryland State official in May 1998 to have believed that executing and issuing retake warrants pursuant to section 682(d) for the arrests and reincarceration of individuals they reasonably believed to have been erroneously released was lawful . . . .

Appellants cite no judicial opinions, and we can find none, stating that it is unlawful to use an escapee warrant to arrest and reincarcerate erroneously released prisoners . . . . Although Appellants contend that Appellees could have obtained the warrants "the old-fashioned lawful way," we decline to impose liability on Appellees based upon their failure successfully to predict the course of the law. Accordingly, even if Appellants' Fourth Amendment right in this particular context were cognizable, these rights were not sufficiently clear at the time of Appellants' arrests to notify reasonable state officials in Appellees' position that their conduct was unlawful, thus entitling Appellees to qualified immunity on Appellants' Fourth Amendment claim.

In the case at bar, West Virginia law clearly establishes a duty on the part of jail administrators and employees to receive and detain any person brought in by any officer or member of any law-enforcement office acting in his or her official capacity. Further, W.Va. Code section 62-

11B-7a establishes that a "home incarceration supervisor" "shall have the authority, equivalent to that granted to a probation officer pursuant to [62-12-10], to arrest a home incarceration participant when reasonable cause exists to believe that such participant has violated the conditions of his or her home incarceration." Section 62-12-10, in turn, allows a probation officer to arrest a probationer at any time with or without a warrant , if there is reasonable cause to believe he has violated any of his conditions of probation.

The undersigned finds, under the above-stated law and case law, that Plaintiff had been "seized" within the meaning of the Fourth Amendment, when he was arrested. The three defendant administrators and employees of the jail, however, did not seize him. Instead, they received him and detained him pursuant to State law, based upon his having been arrested by an officer (62-6-6a), who was also a home incarceration supervisor with the authority to arrest him without a warrant (62-11B-7a). In fact, had they refused to detain him, they would themselves be guilty of a misdemeanor with penalties of up to $200.00 and sixty days imprisonment.

Plaintiff first argues, regarding Ms. Kimball only, that, "to the very best of [his] knowledge," Kimball knew that the Commitment and Release Form was inaccurate, because it did not have a jurisdictional caption, a case number, a designation of whether the charges were felonies or misdemeanors, an amount for bail, any court action or hearing date, a specific length of time for him to be imprisoned or even if it was for temporary commitment, any indication of the county in which he was arrested, what agency the arresting officer represented, and have a return to any court in Marion County. Plaintiff has no evidence in support of his contention that Ms. Kimball knew the form was inaccurate, or even that the form was actually inaccurate.

Significantly, when asked, Plaintiff could not provide any law that supports his position that

the commitment and release form is non-compliant with federal or State law. (Defendant's exhibit F at 111). In fact, he testified that he did not believe there was <u>any</u> law regarding the form. <u>Id.</u> He stated only his "belief" the form was fraudulent "[b]ecause of everything it omits." <u>Id</u> at 112. No party has submitted any law or case law regarding whether the Commitment and Release Form is or is not a valid document for the committal of alleged home confinement violators. Nor could the undersigned find any mention of the form or any other version of the form.

Plaintiff has cited <u>Rogers v. Albert</u>, 208 W.Va. 473, 541 S.E.2d 563 (W.Va. 2000) in support of his argument that the Commitment and Release Order is fraudulent, saying the case states: "It is the law of West Virginia that no person my be imprisoned or incarcerated prior to presentment before a judicial official and issuance of a proper commitment order." Defendant's Ex. F at 113. <u>Rogers</u> expressly does not stand for that proposition, however. In fact, <u>Rogers</u> cites <u>State ex rel. Harper v. Zegeer</u>, 296 S.E.2d 873 (1982) for that proposition, but then distinguishes it. In <u>Rogers</u>, the plaintiff had relied on <u>Harper</u>, stating that "it effectively precludes any post-arrest delay not occasioned by either transport or completion of the administrative steps incident to arrest." The West Virginia Supreme Court of Appeals, however, held:

> Rather than prohibiting <u>any</u> detention prior to presentment before a magistrate, we interpret <u>Harper</u> as merely expressing the longstanding common-law rule that an arrestee may not be held in custody for an unreasonable period of time prior to being afforded an appearance before a neutral judicial officer. <u>See</u> <u>Haney v. Town of Rainelle</u>, 125 W.Va. 397, 404, 25 S.E.2d 207, 211 (1943)(after an arrest, "'the prisoner may be confined in the most suitable place, for a reasonable time, until it is possible for him to be taken before a magistrate.'")

Plaintiff has therefore submitted no evidence, and the undersigned could find none, in support of his contention that the Commitment and Release Form is "False and Fraudulent." Defendants, on the other hand, have submitted a sworn affidavit from Magistrate Melissa Linger,

stating:

> The North Central Regional Jail fulfilled its responsibility in detaining Mr. Horton as he was brought to North Central Regional Jail with a properly signed commitment and release form signed by a home confinement officer.

(Emphasis added). Defendants further submitted a sworn affidavit from Defendant Trent, stating:

> On September 26, 2008, I responded to Mr. Horton's September 25, 2008, inmate grievance after speaking with Marion County Magistrate Melissa Linger. Magistrate Linger informed me it was proper to detain Mr. Horton to the North Central Regional Jail as he was brought to North Central Regional Jail with a properly signed commitment and release form signed by a home confinement officer. . . . [and]

> This Commitment and Release form is a form commonly used by home confinement officers committing individuals to the North Central Regional Jail.

While the undersigned has already found that Magistrate Linger's affidavit is not admissible as proof the Commitment and Release Form on its face is Constitutionally sufficient, a review of these two affidavits show they are made on personal knowledge, show that the affiants are competent to testify on the matter, and do set out other facts that would be admissible in evidence, such as the sworn testimony that the form is commonly used by home confinement officers to commit individuals to the jail, and to show the fact that even the judicial officers consider it a valid document and not a "False and Fraudulent" document, as alleged by Plaintiff.

Plaintiff attached to his own Summary Judgment Motion and Response to Defendants' Summary Judgment Motion Defendant Dobbs' Answers to Interrogatories, in which Dobbs states twice:

> The Home Confinement Commitment and Release Form has been used by the home confinement program in Marion County since I began. The form has always been in the office. I do not know who provided the form.

(Plaintiff's Ex. A-13)

Also attached to Plaintiff's Motion and Response to Defendants' Motion was the Response

34

to Interrogatories of Defendant Benson, who stated:

> The Commitment and Release Form is a form authorizing commitment until a preliminary hearing at a future date . . . . [and]

> Lt. Dobbs is authorized to place an individual who has violated a condition of his or her confinement in custody pending a preliminary hearing . . . . [and]

> Home Confinement Supervisors may place individuals in custody at the Regional Jails. The length and duration of such custody is determined at a later time by a judicial officer.

(Plaintiff's Ex. A 15).

Plaintiff counters these sworn affidavits by arguing that Defendant Kimball knew "to the very best of [his] knowledge and belief," that the Commitment and Release form was inaccurate due to the omissions already noted above. He admits, however, he does not have any evidence that the form is invalid, illegal, or unconstitutional.

Plaintiff also cites to the Regional Jail and Correctional Facility Authority Policy and Procedure Statement in support of his argument that Kimball did not legally receive him into the jail. The Policy and Procedure Statement contains Inmate Admission Procedures, which include: Booking personnel shall ensure the following: "b. Commitment papers are complete and accurate." Under Procedure A: Arrival of Inmate and Initial Processing, the Policy directs:

> 1. When an inmate arrives, usually they will be escorted by a law enforcement officer. The officer must have a certified court order committing the inmate . . . .

> 3. The Booking Officer shall complete the following prior to the departure of the escorting officer:
>     a. Review the commitment papers to ensure papers are certified, <u>valid on their face</u>, and accurate. If inaccuracies exist, the inmate shall not be accepted, and the committing court shall be contacted immediately.

(Plaintiff's Ex. A-17).

As a rule of statutory construction, the West Virginia Supreme Court of Appeals has

repeatedly held that:

> Any rules or regulations drafted by an agency must faithfully reflect the intention of the Legislature, as expressed in the controlling legislation. Where a statute contains clear and unambiguous language, an agency's rules or regulations must give that language the same clear and unambiguous force and effect that the language commands in the statute.

Syllabus Point 4, <u>Maikotter v. University of W.Va Bd. of Trustees</u>, 206 W. Va. 691, 527 S.E. 802

(1999). Similarly, in <u>Rowe v. W.Va. Dept. Of Corrections</u>, 170 W.Va. 230, 292 S.E.2d 650 (1982),

the Supreme Court of Appeals held:

> It is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority.

The West Virginia Code of State Rules, W.Va. C.S.R. section 95-3-18, provides the

minimum standards for operation and management of jail and correctional facilities. Rule 18.3

provides:

> Written policy for admitting new inmates to a holding facility shall address at a minimum the following subjects:
>
>> 18.3.a. Verification of court commitment papers <u>or other legal documentation of detention</u>.

(Emphasis added). The W.Va. Code of State Rules therefore does not require the commitment be

by court order, but only by "legal documentation of detention." While even this rule is somewhat

inconsistent with the Statute that <u>requires</u> the jailer to accept a prisoner brought in by a law

enforcement officer, it at least does not require the documentation be a court order. The Policy and

Procedure, requiring a "certified court order," and stating that if there are inaccuracies, "the inmate

shall not be accepted" is directly in conflict with the statute. The court "is obliged to reject

administrative constructions that are contrary to the clear language of a statute." <u>CNG Transmission Corp. v. Craig</u>, 211 W.Va.170, 564 S.E.2d 167 (2002).

The undersigned finds Kimball's actions in receiving and detaining Plaintiff comported with the requirements of the Statute. Had she not complied she would have herself been subject to criminal penalties.

Plaintiff's affidavit also contains unsupported speculation and conclusory statements that are not sufficient to demonstrate the existence of a genuine issue of material fact regarding Defendants' actions and the motives for their actions. As the Fourth Circuit holds:

> [A] party when confronted with a proper motion for summary judgment on such issue must present "evidence" sufficient to demonstrate the existence of a genuine issue of material fact in such regard. We make no intimations as to what means might have been available for Ward to demonstrate such a genuine issue of material fact, but we do noted that the mere placement by Ward . . . of conclusory allegations and speculative assertions into affidavits or declarations without further legitimate support clearly does not suffice.

<u>Guinness PLC v. Ward</u>, 955 F.2d 875 (4th Cir. 1992).

A number of Plaintiff's statements in his affidavit are such "conclusory allegations and speculative assertions" described in <u>Ward</u>, such as:

> 115. To the very best of my knowledge and belief when Defendant Kimball documented Defendant Dobbs as the Court Judge it was because she knew from the commitment and Release Form that Defendant Dobbs had found me guilty and he committed me to the North Central Regional Jail for an unspecified period of time without possibility of release except by Defendant Dobbs or a court of competent jurisdiction and I should not have been accepted in to the North Central Jail.
>
> 116. To the very best of my knowledge and belief Defendant Kimball knew from the Commitment [sic] and Release Form and the Booking Data Sheet that Defendant Dobbs was not a court judge and by documenting him as a court judge not only was she covering up for Defendant Dobbs but she was preventing the on-call magistrate from Marion County from learning that I had not been charged with a violation of the Order Granting Home Confinement and I needed to be arraigned or released . . . .

142. In my grievance to Defendant Trent I submitted facts that were plausible on their face showing that Defendant Trent was actually aware I was being held for an unreasonably long time without a probale [sic] cause hearing after thirty (30) days . . . .

144. Defendant Trent knew that Defendant Dobbs was not authorized by law to commit or release person(s) to or from the North Central Regional Jail and the Commitment and Release Form was not a document fair on its face, that is process issued by a court because to the very best of my knowledge and belief, the Commitment and Release Form was made and distributed by the North Central Regional Jail Administration and based upon the agreement with Marion County Home Confinement Office Defendant Trent continued my imprisonment in violation of the Fourth Amendment . . . .

146. On September 22, 2008, Defendant King joined the conspiracy when he personally responded to my Appeal and made a conscious choice to cover up and continue my unlawful imprisonment when he stated that "it appears that a check of your commitment orders require the Regional Jail Authority to hold me in their custody . . ."

148. Defendant King to the very best of my knowledge and belief know [sic] that the Commitment and Release Form is not a Temporary Commitment Order and it is the law of West Virginia that no person can be imprisoned or incarcerated in a Regional Jail prior to presentment before a judicial official and issuance of a proper commitment order as Chief of Operations of the West Virginia Regional Jail and Correctional Facility Authority and that Defendant Dobbs was not a judicial official. . . .

167. To the very best of my Knowledge and belief when Marion County Magistrate Melissa Linger caused the Commitment and Release Form to be faxed to her on September 23, 2008, it was the first time a judicial official, a lawyer or a defendant ever reviewed the Commitment and Release Form: 1) the Commitment and Release form is a document created by the North Central Regional Jail Administration and distributed to the Marion County Home Confinement office to circumvent the neutral and detached probable cause determination performed by Magistrate Linger . . . .

172. On September 30, 2008, I filed my Grievance Appeal to Terry Miller, Executive Director, West Virginia Regional Jail and Correctional Facility Authority because Defendant King's response of September 22, 2008, was a duplicate of Defendant Trent's response of September 8, 2008.

173. To the very best of my knowledge and belief Defendant King circumvented the West Virginia Regional Jail Grievance Appeal Procedure to cover up for Defendant Trent and to prevent Mr. Miller from learning that home confinement participants in North Central West Virginia was [sic] being imprisoned int eh North Central Regional Jail illegally and he responded to my Appeal on October 7, 2008.

First, as already found, West Virginia law does not stand for the proposition that a  person

cannot be imprisoned or incarcerated in a Regional Jail prior to presentment before a judicial official Rogers v. Albert, 208 W.Va. 473, 541 S.E.2d 563 (W.Va. 2000). In fact, as already stated, Rogers holds:

> Rather than prohibiting any detention prior to presentment before a magistrate, we interpret *Harper* as merely expressing the longstanding common-law rule that an arrestee may not be held in custody for an unreasonable period of time prior to being afforded an appearance before a neutral judicial officer.

Second, Plaintiff does not produce even a scintilla of evidence to support his "knowledge and belief" as stated above. His beliefs are not "specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

As the Fourth Circuit found in Henderson, Plaintiff here cites no judicial opinions, and we can find none, stating that it is unlawful for the jail to receive and detain Plaintiff on the basis of the Commitment and Release Form signed by the Home Confinement Officer.

Further, although Plaintiff, like the appellants in Henderson, contends that Dobbs could and should have obtained a warrant "the old-fashioned lawful way," we decline to impose liability on these defendants based upon this argument. Accordingly, even if Plaintiff's Fourth Amendment right in this particular context were cognizable, and the undersigned is not convinced they were, these rights were not sufficiently clear at the time of Defendant's commitment to the jail to notify reasonable state officials in these defendants' position that their conduct was unlawful, thus entitling them to qualified immunity on Plaintiff's Fourth Amendment claim.

**Due Process**

Plaintiff also alleges his detention without a hearing for some 48 days violated his due process rights under the Fourteenth Amendment. The Fourteenth Amendment provides that the State shall not "deprive any person of life, liberty, or property without due process of law." In Henderson

v. Simms, et al., 223 F.3d 267 (4th Cir. 2000), cited above, the three re-incarcerated inmates also argued that their reincarceration without a hearing to challenge the basis for the reincarceration violated their rights not to be deprived of liberty without due process of law under the Fourteenth Amendment. The Fourth Circuit directed that Due Process claims are examined in two steps: 1) whether there exists a liberty or property interest which has been interfered with by the State; and 2) whether the procedures attendant upon that deprivation were constitutionally sufficient. Id. at 274. The United States Supreme Court had already found that the requirements of procedural due process applied to parole revocations. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct.2593, 33 L.Ed.2d 484 (1972). The Supreme Court then held that due process required a preliminary hearing at the time of a parolee's arrest and detention "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions, . . . .and a revocation hearing prior to the final decision on revocation and within a reasonable time after the parolee is taken into custody in which the parolee has 'an opportunity to be heard and to show, if he can, that he did not violate the parole conditions, or if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.'" Id. at 488.

The Fourth Circuit extended the two-hearing requirement in Morrissey to revocation of supervised release, and revocation of pardon. See Pope v. Chew, 521 F.2d 400 (4th Cir. 1975), and U.S. v. Copley, 978 F.2d 829 (4th Cir. 1992). Plaintiff's case is more complicated, however. No party has cited, and the undersigned could not find a Fourth Circuit case (or, in fact, any case in any jurisdiction) which answers the following question: What is the liberty interest where a person was convicted of a crime; was sentenced to 12 months imprisonment which was converted to home incarceration with electronic monitoring; where the convicted person waived all his Fourth

Amendment rights in writing in order to obtain home confinement as opposed to incarceration; was subsequently arrested for a home confinement violation; had a probable cause hearing in which probable cause that he violated his home confinement was found; was released on bail pending a final revocation hearing; and was then arrested again, prior to his second, final revocation hearing, for allegedly violating both his home confinement and his bail conditions?

The closest case the undersigned could find was a 2003 Seventh Circuit case, in which the court found that removal of a probationer from a home detention program into a jail was classified as a deprivation of liberty under the due process clause (See Paige v. Hudson, 341 F.3d 642 (7th Cir. 2003)). That is not precisely the case here, as Plaintiff was in between his probable cause hearing and revocation hearing when he was again arrested.

The undersigned needn't definitively answer this question today, however, because, even if Plaintiff was given the benefit of the doubt and the undersigned assumed the existence of a liberty interest, the undersigned also finds the law is sufficiently unclear on this point so as to make summary judgment appropriate with respect to these named Defendants under the doctrine of qualified immunity.

As the Fourth Circuit held in Henderson:

> Even assuming *arguendo*, that a mistakenly released prisoner possesses a liberty interest and the due process right to challenge his arrest at a preliminary hearing and at a hearing just prior to reincarceration, Appellees would still be entitled to qualified immunity on Appellants' Fourteenth Amendment claims because this right was not clearly established that the time of Appellants' arrests. At the time of Appellants' arrests, this Court recognized that the due process requirements of *Morrissey* applied to revocations of pardons and revocations of supervised release. Because the liberty interest of a mistakenly released prisoner differs greatly from the liberty interest of a prisoner who has been pardoned or a prisoner who is on supervised release, it does not automatically follow that a mistakenly released prisoner is entitled to a hearing to challenge his arrest and reincarceration *See Copley*, 978 F.2d at 831. Thus, appellant's Fourteenth Amendment rights in this particular context, even if

recognized, were not sufficiently clear at the time of their arrests to notify reasonable state officials in appellees' position that their denial of a hearing to Appellants was unlawful.

So does the undersigned find that Plaintiff's Fourteenth Amendment rights in his particular case, even if recognized, were not sufficiently clear at the time of his August 5th arrest, to notify reasonable state officials in Defendants' position that the denial of a hearing to Plaintiff was unlawful. It was not these three defendants' duty to provide Plaintiff with a hearing. It was instead their express duty under State law to receive and detain him until they received a court order releasing him.

Plaintiff was, in fact, transported to the court every time a transport order was sent, and was ultimately released from State custody as soon as the court ordered it, albeit to the federal detainer. Plaintiff's affidavit states that to the very best of his knowledge and belief Defendant Kimball knew from the Commitment [sic] and Release Form and the Booking Data Sheet that Defendant Dobbs was not a court judge and by documenting him as a court judge not only was she covering up for Defendant Dobbs but she was preventing the on-call magistrate from Marion County from learning that I had not been charged with a violation of the Order Granting Home Confinement and I needed to be arraigned or released. It is true that a notice of hearing went to Plaintiff at his home address the day he was incarcerated. It is also true, however, that on August 6, 2008, the very next day, Magistrate Vanata signed a Transportation Order to have Plaintiff transported from the jail on August 11, 2008. While this transportation order was not for a hearing for the alleged August 5 violation, it is evidence that at some point between Plaintiff's incarceration on the 5th, and the next day, the Magistrate Court became aware Plaintiff was in the Regional Jail, sent a transport order to the Jail, and the Jail properly transported him to Court for his hearing. Plaintiff cannot therefore support his belief that the defendants purposefully kept the Magistrate Court from finding out he was

42

incarcerated. Further, Defendant Kimball completed the Booking Data Sheet on August 5, 2008, at 5:15, p.m., stating that the arresting officer was Dobbs, the arresting agency was the Marion County Sheriff's Department, the transporting officer was Benson, and the committing jurisdiction was Marion County. While the separate Booking Summary Report does state that Plaintiff was received on a judge's order for violation of home confinement and under Bail Details states that the court judge was "Dobbs," Plaintiff does not explain how the placing of the name Dobbs on the second page of the Booking Summary Report would cause him to be overlooked by the magistrate court. Rule 1(b)(1)A)-(B) of the Administrative Rules for the Magistrate Court of West Virginia requires "the on-call magistrate" to contact the jail between 10:00 and 11:00 p.m. Monday through Friday; between 10:00 and 11:00 am and 10:00 and 11:00 p.m. on Saturdays and holiday; and between 12:00 p.m. and 1:00 p.m. and between 10:00 p.m. and 11:00 p.m. on Sundays. Further:

> The on-call magistrate <u>shall</u> inquire <u>whether any person has been arrested</u> in the county since the close of regular business hours or since the last contact with the jail, or whether anyone confined to the jail is able to post bond. If an arrest has been made or if a prisoner is able to post bond, the magistrate shall proceed immediately to the magistrate court offices to conduct an initial appearance and to set bail for such person, or to accept bond for someone already in jail.

(Emphasis added). Plaintiff only speculates that the reason he was not seen immediately after his arrest is because Kimball wrote Dobbs' name under the space for Judge; however, the magistrate's duty is to inquire "whether any person has been arrested." Plaintiff does not even speculate as to how the name "Dobbs" under Judge, or any name at all, would have made any difference, because, under the Rules, he would still have been a person who had been arrested, whether or not under a Court Order or warrant.

Again, more significantly, the Magistrate's Office obviously was informed Plaintiff was incarcerated at the jail because, while on August 5, the day he was arrested, the office mailed a notice

to his home, the very next day Magistrate Vanata issued a Transport Order to the Jail for Plaintiff's transport to the Magistrate Court on August 11, 2008. There is therefore no dispute that the magistrate's office knew Plaintiff was in the North Central Regional Jail as of August 6, 2008, and that Defendant Kimball did not prevent the magistrate's office from knowing he was at the jail.

Further, Plaintiff had the opportunity to bring his continued detention at the jail without a magistrate hearing to the attention of a magistrate at his hearing on August 11, only 6 days after his arrest. He did not do so. Plaintiff states in his sworn deposition that the reason he did not bring up the "unlawful" arrest of August 5, 2008, at the August 11, 2008 revocation hearing was that he did not know until he saw the Commitment and Release Order on September 23, 2008, that Lt. Dobbs "was the person that committed me to jail on August the 5th" (Defendants' Brief, Exhibit F, p 62). This appears disingenuous to the undersigned, because Plaintiff himself states in his sworn affidavit that on August 29, he requested the booking department at the jail to advise who had committed him. He was advised in response that he was being held on home confinement violations and that Dobbs signed the paperwork. He then states he asked Defendant Trent, in a second grievance, why he was being detained, and Defendant Trent answered on September 8, that he was being held on a home confinement violation signed by the home confinement officer. That, in fact, is Plaintiff's stated reason for naming Trent as a defendant. At his deposition, Plaintiff stated:

> I believe in his response on September the 8th where Mr. Trent advised me that I was being held on a home confinement violation signed by the home confinement officer
> . . . .

Further, Plaintiff's assertion that he did not address that he was detained at the jail because he did not know he had been confined to the jail by Dobbs until September 23, 2008, is also inconsistent with his sworn affidavit stating:

> Attorney Conrad Gall could not intercede into matters of my August 5, 2008, arrest even if he know of the circumstances surrounding my arrest because I was repersented [sic] by Attorney Keith Cox who I was unable to contact and it would have been a violation of the Code of Ethics for Attorney Gall to repersent [sic] my interest in 08-M-289, 669, when I was repersented [sic] by Mr. Cox. (P's affidavit at 121).

The two assertions are also inconsistent in that, as Plaintiff himself admits in his affidavit, Dobbs testified at the August 11, hearing regarding the July 25, 2008, offense, but also testified "that he had taken me into custody on August 5, 2008, because he had discovered me drinking alcohol." Plaintiff's affidavit at 124. Dobbs' testimony clearly informed Plaintiff, his attorney, and the magistrate, that Plaintiff had been arrested again on August 5, and taken into custody by Dobbs. Magistrate Vanata then advised Plaintiff she would revoke his bond unless he accepted the plea and 6-month concurrent sentence. "Based on that threat," he pled guilty to the July 25, 2008, offense. There is, for no reason stated by Plaintiff, any mention that he asked why, if he was released back on home confinement, and if his bond was not revoked, he was still going back to the jail.

Regarding Defendants Trent and King, it is also noteworthy that by the time Plaintiff filed his grievances, he was also being detained on the federal warrant, and could not have been released by either official, despite his demands to both that he be released "immediately." Plaintiff states:

> And furthermore, I believe that Mr. Trent had a duty as administrator of one of these regional jails, when a person makes a claim that I'm being detained illegally in violation of the constitution and the laws of the United States and the West Virginia constitution and the laws that he has a duty to find out whether or not that individual is detained in his jail illegally. Because it should be and probable is, based upon the rules book, that no person shall be imprisoned or confined in a regional without a lawful order. They don't want anybody in jail that's in there illegally.

> Plaintiff then stated, as with Kimball, that Trent's actions were intentional as opposed to negligent, explaining that Trent answered one of his interrogatories by saying he spoke with Magistrate Linger, and Magistrate Linger advised him that Lt. Dobbs had followed the procedures of 62-11-B-9(c) correctly. However, if Lieutenant - - I mean, if Mr. Trent was - - intentions was not to illegally continue my

incarceration, he would have explained to Magistrate Linger that I was in jail on a commitment and release form signed by Lieutenant Dobbs and I had not had an arraignment. And she would have taken affirmative measures to ensure that I had a arraignment and then even if I had had a arraignment, she still could have denied me bond. . . . You follow me? But, he didn't. He didn't tell her the truth. . . . because if he had told her the truth, she would have done something because based upon the same allegations that I made to him, if he had told her, she would have acted because on September the 23rd when I told her the same thing that Mr. Trent should have told her, she dismissed the case.

Trent, did, in fact, contact a judicial officer, the magistrate, in response to Plaintiff's grievance. Trent was then advised by that judicial officer that Plaintiff was properly detained. Plaintiff, however, concludes that the magistrate's answer means that Trent must have lied to her. This conclusion is pure speculation, however, especially because Magistrate Linger swears in her own affidavit that the jail acted properly in detaining Plaintiff until receiving a court order.

Plaintiff submits no evidence in support of his assertion that Magistrate Linger dismissed the July 25, 2008, charges against him because "she made a determination that I had not been charged with a violation of Home Incarceration on August 5, 2008, and I had not appeared before any of the four (4) sitting magistrates in Marion County between August 5, 2008, and September 23, 2008." Even if she did actually dismiss the July 25 charges solely because Plaintiff did not have a hearing on the August 5 violation, Plaintiff offers no evidence, only his own speculation and conclusions, that the three defendants making this motion had anything to do with his not having a timely hearing. Magistrate Linger's (according to Plaintiff) throwing the paperwork across the room and declaring "Case Dismissed" could have easily been due to any number of reasons, including, but not limited to a conclusion that the magistrate court had failed in its duty to provide a prompt hearing. "[Unsupported] speculation is not sufficient to defeat a summary judgment motion." Ash v. United Parcel Serv., Inc., 800 F.2d 409 (4th Cir. 1986). The non-moving party may not "create a genuine

issue of material fact though mere speculation or the building of one inference upon another." <u>Beale</u> <u>v. Hardy</u>, 769 F.2d 213 (4th Cir. 1985).

**King**

The only allegation against Defendant King is for conspiracy, which shall be addressed below.

**Civil Conspiracy <u>(Kimball, Trent, and King)</u>**

To establish a civil conspiracy under section 1983, Plaintiff must present evidence that Defendants King, Kimball, and Trent acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Plaintiff's deprivation of a constitutional right. <u>See</u> <u>Hafner v. Brown</u>, 983 F.2d 570 (4th Cir. 1992).

Defendant King states in his sworn affidavit that responding to Plaintiff's grievance did not require any communication and/or interaction with Defendant Kimball; that any communication he did have with Kimball did not involve any discussion of Plaintiff; that he did not communicate and/or interact with co-defendant Dobbs; that he did not communicate and/or interact with co-defendant Benson; that, in fact, he had never met Dobbs or Benson; that he did communicate with Magistrate Linger regarding the propriety of detaining Plaintiff based on the commitment and release form; and that he did communicate with Defendant King about the content of Plaintiff's grievances, but at no time communicated or discussed any type of conspiracy against any inmate, including Plaintiff.

Defendant King, in his sworn affidavit, states he did not recall ever meeting, communicating, and/or interacting with Defendant Dobbs, Defendant Benson, or Defendant Kimball; and that he did communicate with Trent regarding Plaintiff's grievance appeals to him; but that at no time during

any communication or interaction with Trent did they discuss any type of conspiracy against any inmate, including Plaintiff.

Defendant Kimball, in her sworn affidavit, states that she has on prior occasions communicated with Defendant Benson, as he is a transportation officer who brings individuals to the jail; that she received and reviewed documents provided by Benson regarding Plaintiff; but that at no time did she and Benson speak, communicate, or in any way discuss any type of conspiracy against any inmate including Plaintiff; that as an employee of the jail she did occasionally interact with Defendant Trent; but that at no time during any interaction with Trent did they speak, communicate or in any way discuss Plaintiff, or any type of conspiracy against any inmate including Plaintiff; and that she has never met, communicated, or interacted with Defendant King.

Magistrate Linger also provided a sworn affidavit that the jail did not have the responsibility of setting a hearing for Plaintiff–rather, it was the responsibility of the court to set a hearing; that the jail detained Plaintiff on a "properly signed commitment and release form signed by a home confinement officer;" that it is the responsibility of the jail to detain and individual until it receives an order releasing the individual, which must be signed by a judicial officer; that if Defendant has counsel [and Plaintiff did have counsel appointed] it is counsel's duty to seek release of a defendant; and that it is not the responsibility of the jail to seek the release of individuals from its facilities.

In the face of these sworn affidavits, Plaintiff counters in his own sworn affidavit:

To the very best of my knowledge and beleif [sic] when Defendant Kimball documented Defendant Dobbs as the Court Judge it was because she knew from the Commitmnt [sic] and Release form that Defendant Dobbs had found me guilty and he committed me to the North Central Regional Jail for an unspecified period of time without possibility of release except by Defendant Dobbs or a court of competent jurisdiction and I should not have been accepted in to the North Central Regional Jail.

To the very best of my knowledge and belief Defendant Kimball knew from the Commitmnet [sic] and Release Form and the Booking Data Sheet that Defendant Dobbs was not a court judge and by documenting him as a court judge not only was she covering up fro Defendant Dobbs but she was preventing the on-call magistrate from Marion County from learning that I had not been charged with a violation of the Order Granting Home Confinement and I needed to be arraigned or released.

(Plaintiff's affidavit at 155, 116).

In my Grievance to Defendant Trent I submitted facts that were plausible on their face showing the Defendant Trent was actually aware I was being held for an unreasonably long time without a probale [sic] cause hearing after thirty (30) days.

Defendant Trent's response factually advised me that I was committed for home confinement violations by Defendant Dobbs.

Defendant Trent knew that Defendant Dobbs was not authorized by law to commit or release person(s) to or from the North Central Regional Jail and the Commitment and Release Form was not a document fair on its face, that is process issued by a court because to the very best of my knowledge and belief, the Commitment and Release Form was made and distributed by the North Central Regional Jail Administration and based upon the agreement with Marion County Home Confinement Office Defendant Trent continued my imprisonment in violation of the Fourth Amendment.

(Plaintiff's affidavit at 142, 143, 144).

On September 12, 2008, I filed a Grievance appeal to Defendant King stating: Officer Boawright [sic] and Mr. Trent recognize that I am datelined in NCRJ by Mr. Dobbs for Home Confinement violations.  Mr. Dobbs is a Lt. of the Marion County Sheriff's Department.  Lt. Dobbs is not a judicial official and Mr. Dobbs lacked capacity to detain me in NCRJ without a commitment order signed by a magistrate or circuit court judge.

On September 22, 2008, Defendant King joined the conspiracy when he personally responded to my Appeal and made a conscious choice to cover up and continue my unlawful imprisonment when he stated that "it appears that a check of your commitment orders require the Regional Jail Authority to hold me in their custody . . ."

To the very best of my knowledge and belief Defendant King's response of September 22, 2008, advised me that the False and Fraudulent Commitment and Release Form signed by Defendant Dobbs required them to hold me in their custody until they recieved [sic] court notice releasing me.

Defendant King to the very best of my knowledge and belief know [sic] that the Commitment and Release Form is not a Temporary Commitment Order and it is the law of West Virginia that no person can be imprisoned or incarcerated in a Regional Jail prior to presentment before a judicial official and issuance of a proper commitment order as Chief of Operations of the West Virginia Regional Jail and Correctional Facility Authority and that Defendant Dobbs was not a judicial official.

To the very best of my Knowledge and belief Defendant King circumvented the West Virginia Regional Jail Grievance Appeal Procedure to cover up for Defendant Trent and to prevent Mr. Miller from learing [sic] that home confinement participants in North Central West Virginia was [sic] being imprisoned in the North Central Regional Jail illegally and he responded to my Appeal on October 7, 2008.

(Plaintiff's Affidavit at 173).

Plaintiff concludes the only reasonable inference is that Defendants King, Kimball and Trent conspired to keep him in jail. The undersigned disagrees with the inferences Plaintiff asks this court to draw. Plaintiff has a weighty burden to establish a civil rights conspiracy. While he need not produce direct evidence of a meeting of the minds, he must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. See Hafner v. Brown, 983 F.2d at 675-577; Abercrombie v. City of Catoosa, Ok., 896 F.2d 1228 (9th Cir. 1990); Fonda v. Gray, 707 F.2d 435 (9th Cir. 1983). In other words, to survive a properly supported summary judgment motion, Plaintiff's evidence must, at least, reasonably lead to the inference that Defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

Plaintiff's evidence fails in this regard. Plaintiff did not produce any evidence, either direct or circumstantial, that Defendants acted in concert to keep him detained unlawfully. Nor does Plaintiff's evidence give rise to an inference that each alleged conspirator shared the same conspiratorial objective. "The problem with [Plaintiff's] evidence is not merely that each act alleged is capable of an innocent interpretation. Rather, the problem is that [Plaintiff's] evidence amounts

to nothing more than rank speculation and conjecture.  It does not reveal that any member of this alleged conspiracy possessed an intent to commit an unlawful objective." See Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416 (4th Cir. 1996).

When asked in his deposition if he ever saw Kimball interact with Benson, Plaintiff replied he had not.  He also did not witness or have any evidence that Kimball had any interaction with Lt. Dobbs.  He had no evidence that Kimball had any interaction with Trent, except that "Mr. Trent had to speak with the booking clerk concerning Roy Horton when he answered my grievance on September the 8th when he advised me that I was being detained on a home confinement violation signed by the home confinement officer." Ex. F. At 94.  When asked why Trent must have spoken with Kimball, Plaintiff answered: "How else was he going to find out?"  When asked whether Trent could have obtained the information from the commitment and release form or data sheet, Plaintiff responded," I will assume that he did that, but I don't know for sure."  Id.  The following colloquy then took place:

Q:     So in terms of direct knowledge that Mr. Trent discussed or had some type of agreement with Brenda Kimball in this particular matter, you have no direct knowledge?

A:     No.

Q:     You're assuming that there was some type of interaction between them to obtain - - for him to respond to your grievances?

A;     I am basing it upon the grievances that Mr. Trent signed.

Q:     Ok.  Okay.  That he had some contact with Ms. Kimball?

A.     Yes.

Q.     Okay.  And to the extent that - - and what I want to ask you is in the sense you've already

told me that you don't believe - - you don't have any evidence that there was any communication or interaction between Ms. Kimball and Mr. Benson and Mr. Dobbs, you don't have any evidence that there was a conspiracy there. Direct - - direct - -

A.     Evidence.

Q      Evidence?

A.     No, I do not.

Q.     . . . . There's nothing that you can point me to directly to show that there was some type of an agreement or some type of a cohesive plan for Benson, Dobbs, and Kimball to commit you and violate your constitutional rights?

A.     In answering that I'll answer that this was: With the 20 – what is it? – 24, 25 documents that I have submitted with the complaint and incorporated into the record, it establishes a pattern, okay? One right after the other just like dominoes; they work in coherent - - they are coherent with one another.

Q.     Okay.

A.     And that is enough to establish a conspiracy.

Q.     Okay. And that - - and just so I'm clear, that is your basis for your conspiracy?

A.     Yes, because the ultimate objective of it was to incarcerate Roy Horton.

Q.     Okay.

A.     And every one of them participated in incarcerating Roy Horton and keeping Roy Horton incarcerated in the North Central Regional Jail.

Q.     Okay. And as it relates to - - and let me - - and this maybe - - saves us some questions - - as it relates to Mr. King and Mr. Trent, is that the same basis for your belief that they're

involved in this conspiracy - - the paper trail that you reference?

A.    What it is - - their communication with one another - - it establishes one thing: To keep Roy

Horton incarcerated.

Q.    And that is based on the documents you have, correct?

A.    Yes.

Q.    You don't have any other - - what I'm trying to make sure is that I understand exactly what

evidence you have to support your claims.  And you're supporting - - what you reference as

supporting your claims are the documents you've attached to your - -

A.    Yes, sir.

Q.    To your complaint and to the discovery, correct?

A.    Yes.

Id. at page 94-97.

> While we recognize that direct evidence of a conspiracy is not always available, we
> cannot use this fact as an excuse to forgive Plaintiff's failure to prove his case.  There
> is a reason why we do not allow this level of conjecture to determine lawsuits: Such
> adventures of the mind tend to be unreliable.  Appellants' conspiracy claim was ripe
> for an adverse summary judgment determination; it was based upon a theory without
> proof. [Plaintiff's] circumstantial evidence was probative of a conspiracy only
> through speculation and the piling of inferences; hence, the district court properly
> dismissed this claim.

Hinkle v. City of Clarksburg, WV, 81 F.3d 416, 423 (4th Cir. 1996).

**Conclusion**

For all the reasons herein stated, the undersigned United States Magistrate Judge finds there

are no genuine disputes of material fact in this matter, and that Plaintiff has failed to overcome

Defendants' Motion for Summary Judgment.

## RECOMMENDATION

For the reasons herein stated, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** "Defendants Brenda Kimball, George Trent, and John L. King, II's Motion for Summary Judgment" [Docket Entry 176] be **GRANTED** and this action be **DISMISSED with prejudice** as to these defendants.

Any party may, within fourteen (14) calendar days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk for the United States District Court for the Northern District of West Virginia is directed to provide a copy of this Report and Recommendation/Opinion to counsel of record and by Certified Mail, Return Receipt Requested, to Plaintiff *pro se.*

Respectfully submitted this 3rd day of June, 2011.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE