# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ROY HORTON,**
            **Plaintiff,**

*vs.*                                    **CIVIL ACTION NO. 1:09CV114**

**LT. WESLEY DOBBS, Marion Co.
Sheriff's Dept.; OFFICER BENSON,
Transportation Officer, Marion Co.
Sheriff's Dept.; OFFICER B. KIMBALL,
Booking Officer, North Central Regional Jail;
GEORGE TRENT, Administrator,
North Central Regional Jail, JOHN L. KING,
Chief of Operations, West Virginia Regional
Jail Authority,**
            **Defendants.**

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS WESLEY DOBBS AND CLAUDE BENSON'S MOTION FOR SUMMARY JUDGMENT [DE 181] AND PLAINTIFF ROY HORTON'S MOTION FOR SUMMARY JUDGMENT [DE 201]

This matter is before the undersigned United States Magistrate Judge pursuant to "Defendants Lt. Wesley Dobbs and Officer Claude Benson's Motion for Summary Judgment" filed on March 11, 2011 [Docket Entry 181]; "Plaintiff's Motion for Summary Judgement against Dobbs and Benson" filed April 18, 2011 [Docket Entry 201]; Plaintiff's "Combined Affidavit for Summary Judgement against Defendant Dobbs and Benson and in Opposition to Defendants' Kimball, Trent and Kings Motion for Summary Judgement Pursuant to Rule 56" filed on April 19, 2011[Docket Entry 202]; and "Defendants, Lt. Wesley Dobbs and Officer Claude Benson's, Response to Plaintiff's Motion for Summary Judgment" filed April 29, 2011 [Docket Entry 208].[1] All motions filed in this case were referred to the undersigned United States Magistrate Judge by Order entered

---

[1]This Report and Recommendation does not address Defendants Kimball, Trent and King's separate Motion for Summary Judgment, which has been decided and Report and Recommendation entered separately.

October 30, 2009 [Docket Entry 24].

## Statement of Facts

Plaintiff Roy Horton was sentenced by this Court in November 1995, on charges of Aiding and Abetting in the Distribution of Cocaine (Count One) and Possession of a Firearm during a Drug Transaction (Count Four).  He was sentenced to 120 months imprisonment and 4 years supervised release for Count One, and 60 months imprisonment (to be served consecutive to Count One) for Count Four.  See U.S. v. Horton, 1:93cr40 (N.D.W.Va.).

Plaintiff  was released and supervision commenced on December 22, 2006.  Id.

In June 2007, Plaintiff enrolled in and commenced classes at West Virginia Business College, in its Nationally Accredited Paralegal Program.  Plaintiff's affidavit at paragraph 4.

The Paralegal Program consisted of six (6) quarters to graduate with an Associates Degree in Paralegal Studies.  Id. at paragraph 5.

On February 23, 2008, Plaintiff was arrested by Fairmont City Police Officer Eric Hudson and charged with DUI, Driving on Revoked or Suspended License, No Registration, and No Proof of Insurance in Marion County Magistrate Court,  Case No's. 08-M-288, 289, 290, and 291. Id. at paragraph 6.

As a result of the above State arrest, Plaintiff was arrested on federal charges of violating his Federal Supervised Release on March 4, 2008.  Id. at paragraph 7.

Pursuant to the above arrest, the District Court modified Plaintiff's Conditions of Supervised Release to include residence and completion of inpatient substance abuse treatment through the VA Hospital in Clarksburg, WV.  Plaintiff completed the program on April 22, 2008.  Id. at paragraph 8.    On May 4, 2008, Fairmont Police Officer Hudson again arrested Plaintiff on charges of

Driving on Suspended or Revoked License for Previous DUI, in Marion County Magistrate Court, Case No. 08-M-669.

On May 8, 2008, Plaintiff's United States Probation Officer filed a "Petition for Warrant or Summons for Offender Under Supervision," alleging that Plaintiff violated a mandatory condition of his supervised release requiring that he not commit another federal, state or local crime, and that he also violated the Standard Condition requiring him to notify his probation officer within 72 hours of being arrested or questioned by a law enforcement officer. See U.S. v. Horton, 1:93cr40, at Docket Entry 167. In support of the allegations, the Petition states that on Sunday, May 4, 2008, at 10:45 a.m., Plaintiff was arrested by the Fairmont Police Department and charged with "Driving on a Suspended License for a Previous DUI Conviction." The petition recommended modifying Plaintiff's Federal supervised release to include three (3) months of community confinement at Bannum Place in Clarksburg, West Virginia. A summons was issued for Plaintiff to appear before the undersigned United States Magistrate Judge for a preliminary hearing on May 28, 2008. Id.

On May 9, 2008, Plaintiff appeared with counsel Keith Cox, before Marion County Magistrate Melissa Pride-Linger and entered a guilty plea to two (2) counts of Driving While License Revoked or Suspended for DUI, Second Offense in Cases 08-M-289 and 669. Plaintiff's affidavit at paragraph 11. Plaintiff was sentenced to twelve (12) months incarceration, which Magistrate Pride-Linger suspended, instead ordering him to Home Incarceration with electronic monitoring for a period of twelve (12) months beginning on June 9, 2008. Id. at paragraph 12.

On May 28, 2008, Plaintiff appeared before the undersigned United States Magistrate Judge for preliminary hearing on the petition for violation of Federal Supervised Release. The Court heard the testimony of Plaintiff's supervising United States Probation Officer John Burlas, who had filed

the Petition.  Officer Burlas advised that Plaintiff had pled guilty to the State offense of Driving on a Suspended License, as well as the underlying offense of Driving Under the Influence.  U.S. v. Horton, 1:93cr40.

The undersigned United States Magistrate Judge found there was probable cause that Plaintiff had violated his conditions of supervised release.  U.S. v. Horton, 1:93cr40.

Officer Burlas advised that the State court had sentenced Plaintiff to one year of home confinement with electronic monitoring, to begin on June 10, 2008.  U.S. v. Horton, 1:93cr40.

In light of the State sentence, Officer Burlas changed his recommendation from placement at Bannum Place to a recommendation that final hearing on the current Petition be held in abeyance until the Defendant "successfully completed" his one year of State home confinement on electronic monitoring.  The undersigned United States Magistrate Judge agreed and recommended to the District Judge that the final hearing on the Petition be held in abeyance until Plaintiff "successfully completed" his State sentence of one year of home confinement on electronic monitoring.  Plaintiff and his counsel agreed to this recommendation as an appropriate disposition of the Petition.  U.S. v. Horton, 1:93cr40.

On June 7, 2008, prior to the start of Plaintiff's home incarceration on his guilty pleas for driving on revoked for DUI, Fairmont Police Officer Hudson arrested Plaintiff on a charge of Permitting Unauthorized Driver and Permitting DUI 2nd in Marion County Magistrate Court, Case No. 08-M-871, 872.  Plaintiff's affidavit at 20.

Plaintiff was transported to the North Central Regional Jail and committed and imprisoned on the Criminal Complaint of Officer Hudson pending appearance before a State magistrate. Plaintiff's affidavit at 21.

4

That same day, Marion County Magistrate Pride-Linger conducted an initial appearance via video, advising Plaintiff of his rights and setting bail on each charge at $5,000.00 cash/surety. Plaintiff's Exhibit AB-2.

Plaintiff was committed to the North Central Regional Jail pending posting of bail. Plaintiff's Ex. AB-3.

On June 9, 2008, Plaintiff posted bail and was released by Marion County Magistrate Peggy Twyman. Plaintiff's Ex AB-4.

On June 9, 2008, Plaintiff presented to Defendant Lt. Wesley Dobbs, Home Incarceration Supervisor for Marion County and an employee of the Marion County Sheriff's Department. Plaintiff's affidavit at 26.

Defendant Dobbs and Plaintiff discussed Plaintiff's attendance at school and Plaintiff's medical condition. Defendant Dobbs approved Plaintiff's being outside his residence from 6:00 a.m. though 6:15 p.m. in order to attend school and school-related activities. He also permitted Plaintiff to be outside the residence from 7:00 p.m. until 9:00 p.m. to attend AA and NA meetings. Plaintiff's affidavit at 31 and 32.

Defendant Dobbs provided Plaintiff with four pages of documents. The first is "Equipment Rules" (regarding the use and requirements of the electronic monitoring system); the second and third pages were an "Agreement to Comply with Rules;" and the Fourth page is entitled "Waiver of all Fourth Amendment Rights." Plaintiff's affidavit and Exhibits.

Plaintiff claims he explained to Dobbs that he did not have his reading glasses and could not read the above documents. He claims Dobbs read or explained the documents to him. He claims Dobbs referred to the "Waiver of all Fourth Amendment Rights" form as a "Consent to Search"

form. Plaintiff asked Dobbs if he was required to sign the Consent to search form, and Dobbs advised that signing was not only standard practice for home incarceration participants, but also that if he refused to sign Lt. Dobbs would commit him to the North Central Regional Jail until he either signed or served the original 12-month sentence. Plaintiff's affidavit at 40.

Dobbs admits signing all the forms. He claims he signed the "Waiver of all Fourth Amendment Rights" form against his will in order to stay out of jail, to continue attending school, and to continue receiving medical care. He claims he was not provided a copy of the documents. He claims that "but for" Dobbs' misrepresentation of the facts, he would not have signed "what he now knows to be a Waiver of all Fourth Amendment rights, under any circumstances." Plaintiff's affidavit at 42. Nevertheless, he did sign the forms and there is no evidence anywhere in the record that Plaintiff signed under protest or coercion.

On June 13, 2008, United States District Judge Irene M. Keeley agreed with the undersigned U.S. Magistrate Judge's recommendation of May 28, 2008, and ordered the Petition filed May 8, be held in abeyance until Plaintiff successfully completed his year of home confinement on electronic monitoring to begin June 10, 2008. In her Order, she expressly stated:

> During that year, were Horton to violate any condition of his home confinement or supervised release, then Officer Burlas would recommend that Horton go straight to a final hearing without another preliminary hearing in this matter . . . . should Horton fail to comply with either the terms of his home confinement or the terms of his supervised release, the Court will conduct a final revocation hearing in this matter.

U.S. v. Horton, 1:93cr40.

On June 13, 2008, Attorney Conrad Gall was appointed to represent Plaintiff on the charges of Permitting Unauthorized Driver and Permitting DUI 2nd, cases 08-M-871 and 872 (the June 7 charges). Plaintiff's affidavit at 43.

On June 16, 2008, United States Probation Officer Burlas filed a subsequent Petition advising that on June 7, 2008, Plaintiff was arrested by the Fairmont Police Department for the offenses of Knowingly Permitting an Unlicenced and Intoxicated Person to Operate his vehicle. (Magistrate court cases 08M-871 and 872.). Officer Burlas advised the Court that Plaintiff had been arrested and received by the North Central Regional Jail on June 7, 2008, and released on June 9, 2008. Plaintiff had promptly notified Officer Burlas of this arrest. Further, Plaintiff denied knowing the driver of his vehicle had no licence or that he was intoxicated, and planned to pursue the matter to trial. Officer Burlas therefore recommended no further action regarding the Federal Supervised Release until the pending state charges were resolved. United States District Judge Keeley agreed with this recommendation. U.S. v. Horton, 1:93cr40.

On June 23, 2008, Attorney Gall filed a Motion for Jury Trial on the June 7, 2008, State charges of Permitting Unauthorized Driver and Permitting DUI 2nd in Marion County Magistrate Court, Case Nos. 08-M-871, 872. Plaintiff's affidavit at 45, Ex. AB-7.

On July 25, 2008, Fairmont Police Officer Glen Staley arrested Plaintiff for DUI. Plaintiff's affidavit at 46.[2] Officer Staley's incident report states that he saw two vehicles stopped after an accident. He asked who was driving. Plaintiff said he was not driving, but the other man in Plaintiff's car and the driver of the other car both said Plaintiff was the driver. Officer Staley detected a strong odor of alcohol and performed a field sobriety test which Plaintiff failed. He then administered a preliminary and Breathalyzer test, with results of .135%. Officer Staley arrested Plaintiff for DUI, transported Plaintiff to the Fairmont Police Department at approximately 8:30

---

[2]Plaintiff alleges that Officer Staley did not have probable cause to arrest him "when he was not privy to me allegelly [sic] operating a motor vehicle under the influence of alcohol." Plaintiff's affidavit. Officer Staley is not a party to this action and the undersigned finds Plaintiff's claim of no probable cause for the arrest is not relevant to this motion.

p.m., and processed him. Officer Staley released him on bond at 9:50 p.m. "due to the amount of calls on the shift." Plaintiff's Ex A-7.

Officer Staley did not charge Plaintiff with a criminal offense on July 25, 2008, nor did he issue a Citation to appear in court for DUI. Plaintiff's affidavit at 48, Ex. 7(a).[3]

On July 28, 2008, the Marion County Prosecutor moved to have Plaintiff's bond revoked due to the June 7th violation of Permitting Unauthorized Driver and Permitting DUI 2nd in Marion County Magistrate Court, case no 08-M-871, 872. Plaintiff's affidavit at Ex. AB-8.

On July 28, 2008, Plaintiff's United States Probation Officer Burlas made an entry in his log stating that he had made contact with the Marion County Home Confinement office, which confirmed Plaintiff's arrest on July 25. It was reported that Plaintiff had been away from his residence from 8:21 to 9:52, and the accident happened at 8:25. Plaintiff's home confinement officer was out of town, but the office employee was going to "go ahead and type up order for revocation and officer would sign when he returned." Plaintiff's Ex A-18.

On July 30, 2008, Home Confinement Officer Dobbs filed a Petition in Marion County Magistrate Court for an Order or Warrant for Plaintiff's arrest for violation of his home incarceration on July 25, by being outside his approved residence, and consuming alcoholic beverages. The Petition was granted by Marion County Magistrate Peggy Twyman. Plaintiff's affidavit at 53.

On July 30, 2008, Plaintiff left a voice mail with Probation Officer Burlas, stating that the State violated him on the charges from the arrest on July 25, and he was to self-report by 2pm. Id.

---

[3]Plaintiff alleges "to the very best of his knowledge and belief," that Officer Staley arrested him without probable cause in order to get his blood alcohol level and to keep him outside his residence without prior approval to cause a violation of his Home Incarceration and Federal Supervised Release. Plaintiff's affidavit at 49. There being no allegations against Officer Staley, the undersigned finds Plaintiff's belief as to his motive is not relevant to Plaintiff's complaint.

On July 31, 2008, Lt. Dobbs arrested Plaintiff on the alleged home confinement violations of July 25. Plaintiff's Ex. A-8.

Plaintiff appeared before Magistrate Twyman who arraigned him on the July 25 violation. Plaintiff stated he wanted attorney Keith Cox appointed for him. Attorney Cox was not available, however, and Magistrate Twyman set bail in the amount of $531.00 and proceeded to hold a preliminary hearing. Plaintiff's affidavit at 58.[4]

Magistrate Twyman found probable cause that Plaintiff violated his conditions of home confinement on July 25, advised Plaintiff that a final revocation hearing would be set at a later date, and issued a Jail Commitment Order. Ex. A-9. Dobbs took custody of Plaintiff and escorted him to the Marion County Transport Facility, advising him that he had one hour to post bail or he would have someone transport him to the North Central Regional Jail. Plaintiff's affidavit at 63.

Dobbs then advised someone at the transportation facility to allow Plaintiff to use the phone to try to arrange bail. Plaintiff contacted Rev. John Brown who appeared in court and posted bond. Plaintiff's affidavit at 64 and 65, Exs. A10, 11, 11(a). Magistrate Twyman ordered Plaintiff's release on bail. He had not yet been transported to the North Central Regional Jail.

On August 4, 2008, Plaintiff contacted his USPO John Burlas to report that he made bail on the violation of home confinement (July 25) case and was home, but stated he was positive his home confinement would be revoked and understood that his federal supervised release would also

_____

[4]Plaintiff alleges Magistrate Twyman heard the exclusive testimony of Dobbs and found probable cause based only on this testimony. He alleges he was not ever asked if he would testify and would not have done so "because I was not represented by counsel." There are no allegations against Magistrate Twyman in the Complaint and this allegation is therefore not material to any issues in this motion.

be revoked. Officer Burlas's notes say Plaintiff "States he could use a break ie...go back to prison."[5]

Plaintiff said he would, however, fight the July 25 DUI violation because he was innocent and was not the driver, but would lose because the actual driver and the witness would both say he was driving. Plaintiff told Officer Burlas he planned to go to school that week because he got paid to go, "so he will have some monies when he does go back to prison." Officer Burlas instructed Plaintiff to keep him current on his status and whereabouts. Plaintiff's Ex. A-18.

On August 4, 2008, Marion County Magistrate Reed-Vanata granted the State prosecutor's motion to revoke based on the June 7 charges, stating: "Will hear on 8/11/08 at 1:00 p.m."

On August 5, 2008, Lt. Dobbs went to Plaintiff's residence based on a tip either from an informant or, as Plaintiff believes, from Fairmont Police Officer Hudson, that Plaintiff was seen carrying beer from the Go Mart to his residence. Dobbs entered Plaintiff's residence. Dobbs found Plaintiff behind an open door in the bathroom. Dobbs arrested Defendant. These facts are not in dispute. There is also no dispute that Dobbs had no warrant to search the residence or arrest Plaintiff. While these facts and the arrest are not disputed, the facts underlying the arrest are very much in dispute.

Defendant Dobbs contends that after he was informed Plaintiff was seen in possession of alcohol walking from a nearby convenience store back to his home, he phoned Plaintiff and asked him to come to the Home Confinement Office. Dobbs Affidavit at 12. Plaintiff responded that he needed some additional time. Dobbs agreed to that request and instructed Plaintiff to report to the office by 1:00 p.m. Dobbs affidavit at 13. Dobbs contends that Plaintiff did not arrive at the office by 2:00 p.m., and he again phoned Plaintiff's residence. This time the phone was answered by an

_____

[5]Plaintiff denies making this statement to Officer Burlas.

10

unknown female, who said Plaintiff had already left. Dobbs contends he knew this was not true because of the short distance between Plaintiff's residence and the office. He requested Deputy Alkire accompany him to Plaintiff's residence. Dobbs affidavit at 14. Dobbs states that he and Deputy Alkire arrived at the residence and knocked on the door. A female said Plaintiff was not there, but Dobbs knew this was a lie because he observed Plaintiff's home confinement equipment in the living room. The officers entered the house and began to search for Plaintiff. Dobbs affidavit at 15. Upon entering the house, Dobbs observed a partially consumed bottle of Crown Royal on a table and several empty beer bottles. Dobbs affidavit at 16. The officers then found Plaintiff hiding behind a door. Dobbs drew his service weapon and ordered Plaintiff to come out. Dobbs affidavit at 17. Plaintiff was handcuffed and taken from the residence. Dobbs affidavit at 18. Dobbs states he then took Plaintiff to the Home Incarceration Office and filled out a Commitment and Release Form. Dobbs affidavit at 19. Dobbs then took Plaintiff to transportation officer Benson who then transported Plaintiff to the jail. "As it was past the end of my shift for the day, I went home." Dobbs affidavit at 20-21. Early the next morning Dobbs called the Marion County Magistrate Court and notified them of Plaintiff's arrest and detention at the jail. Dobbs affidavit at 22.

Plaintiff, on the other hand, states in his sworn affidavit that at a little after 11:00 am, he walked to the Go-Mart, where he purchased two packs of cigarettes, a loaf of bread, and a 6-pack of Pepsi Cola. Plaintiff's affidavit at 70-71. ( In his sworn deposition, Plaintiff had stated he had bought only a pack of cigarettes. Def. Exhibit 15 at 35.) While walking home, a Fairmont Police vehicle passed him. Affidavit at 72. He arrived at his residence at approximately 11:35, and remained in the residence alone, with the front door closed "due to the air conditioning being on." Plaintiff's affidavit at 74. Plaintiff stated in his sworn deposition that Dobbs' assistant Marlene

contacted him a little bit after 1:00 pm, and told him that he had been seen carrying a case of beer,

and "to go on ahead and turn [himself] in." Ex. 15 at 36-37. He told Marlene he "would be down

there at 2:30." Id. at 37. At approximately 2:24 "to the very best of [his] knowledge and belief"

Dobbs and Alkire arrived at his residence in different vehicles. "To the very best of [his] knowledge

and belief Defendant Dobbs and Deputy Alkire discussed how to proceed in to my residence to affect

my arrest."[6] At approximately 2:26 p.m., he left the livingroom and went to use the bathroom "and

when I entered the bathroom I left the door open with the light off . . . . I was home by myself and

it was not necessary to close the door . . . . At approximately 2:30 p.m., I heard my front door open

. . . . I stepped back from the commode in order to look through the vanity mirrow [sic] on the wall

at an angle to try and see who had entered my residence without knocking and without my

permission . . . . I stepped back towards the wall closer to the bathroom door in order to get a direct

view (via  mirrow [sic] on wall in kitchen ) in to my living-room to see who had entered my

residence . . . . I saw Defendant Dobbs and Deputy Alkire and I heard Defendant say "GPS SAYS

HE'S HERE." . . . . I saw Defendant Dobbs draw his weapon and advance towards my kitchen area

. . . . I did not make a sound or any sudden moves for fear of being shot or murdered by Defendant

Dobbs . . . . When Defendant Dobbs reached my bathroom door he stuck his pistol around the corner

and shouted, 'COME ON OUT OF THERE SUCKER,' and Deputy Alkire reached in to the

bathroom and pulled me out and in to my kitchen area . . . . Deputy Alkire threw me to the floor,

kicked me in my ribs and handcuffed me while Defendant Dobbs pointed his pistol at my face . . .

. At approximately 2:45 p.m., Defendant Dobbs caused Deputy Alkire to transport me in his Marion

County Sheriff's Police Cruiser to the Marion County Sheriff's Transport Facility wereas [sic]

---

[6]The undersigned notes that these "beliefs" are pure speculation because Plaintiff later
states he did not know who came into his house. They are therefore not facts.

Defendant Dobbs left my residence in his Home Confinement Vehicle . . . . Deputy Alkire caused me to be imprisoned in isolation, in handcuffs, in the Marion County Sheriff's Transport Facility, against my will and without my consent."[7]  Plaintiff's affidavit at 71-88.

Defendant Dobbs did not advise Plaintiff of the reason for the arrest nor did he provide Plaintiff with a copy of a warrant for his arrest.  Plaintiff's affidavit at 75-77.

The transport facility is located approximately 200 yards from the Magistrate Courts. Plaintiff's affidavit at 89.

Dobbs did not request a warrant from a Magistrate.  Plaintiff's affidavit at 91.

Dobbs did not take or have Plaintiff taken before a Magistrate before having him transported to the jail.

Dobbs signed a "Commitment and Release Form" committing Plaintiff to the North Central Regional Jail for violation of Rules 1, 5, and 10 of his home confinement.

Dobbs did not prepare an incident report regarding the arrest of August 5, 2008.

Defendant Benson is a transportation officer for the Marion County Sheriff's Department.

Dobbs gave Benson the Commitment and Release Form to have Plaintiff  transported to and committed to the North Central Regional Jail.

Benson placed Plaintiff in the transport van and transported him at approximately 4:15 pm, to the North Central Regional Jail, at which he arrive at approximately 5:15 p.m. Plaintiff's affidavit at 103-104.

Benson presented the Commitment and Release Order to Defendant Kimball, booking officer at the North Central Regional Jail. Plaintiff's affidavit at 105.

---

[7]Deputy Alkire is not named as a defendant in this matter.

Kimball provided Benson a Booking Data Sheet to partially complete, and then herself completed section 2 stating that Dobbs was the arresting officer. The Booking Data Sheet says the arresting agency was the Marion County Sheriff's Department; the arresting officer was Wesley Dobbs; the transporting officer was Officer Benson; and the committing jurisdiction was Marion County. Defendants Dobbs and Benson's Exhibit 8.

Kimball also completed and electronically signed a "Booking Summary Report" filling in blanks that stated the Order Details as "offense code" VHCON (violation of home confinement); "Statute" WVCC (West Virginia Criminal Code); "Offense Description" "Violate Home confinement;" "Bail Details" - - - Court Judge Dobbs; "Type" Judge's orders. Ex. 9 to amended complaint.

On August 5, 2008, the Magistrate Court of Marion County sent a Notice to Appear to Plaintiff at his home address notifying him a hearing before Magistrate Pride-Linger on August 13, 2008, regarding the June 7 violation. Plaintiff did not receive this notice because he was committed to the North Central Regional Jail that same date, before the notice was delivered to his residence.

On August 6, 2008, the day after Plaintiff was incarcerated, the Marion County Magistrate Court sent a Transport Order to the North Central Regional Jail, ordering the North Central Regional Jail to transport Plaintiff to the Marion County Magistrate Court on the 11th day of August, 2008 for a hearing in the 08M-871 and 872 cases (the June 7, 2008, arrest on charges of Permitting Unauthorized Driver and Permitting DUI 2nd.) Defendants Dobbs and Benson's Exhibit 14.

On August 10, 2008, Plaintiff's United States Probation Officer John Burlas noted he had made contact with the jail, which advised Plaintiff was received on August 5, brought in by a home confinement officer on a home confinement violation. Plaintiff's Ex. A-18.

On August 11, 2008, United States Probation Officer Burlas contacted the Marion County Home Confinement office and was advised Plaintiff had been arrested and taken into custody on August 5. He was informed that home confinement officers had made a home visit and discovered Plaintiff had been drinking alcohol. Plaintiff's Ex. A-18.

On August 11, 2008, Plaintiff appeared in the Marion County Magistrate Court before Magistrate Reed-Vanata in Case No's. 871 and 872, regarding the June 7, 2008, arrest on charges of Permitting Unauthorized Driver and Permitting DUI 2nd. He had been transported to the Magistrate Court pursuant to the Transport Order sent to the North Central Regional Jail by the Magistrate's office on August 6, 2008, the day after his arrest by the home confinement officer. Plaintiff was represented by Attorney Conrad Gall. Attorney Gall advised Plaintiff the State was offering to drop the charge of permitting an unauthorized driver if he entered a plea of guilty to Permitting DUI, Second. If he did so he would be sentenced to six months to run concurrent with the home confinement sentence.

Plaintiff advised Attorney Gall he wanted to go to trial on those charges.

Plaintiff contends that on August 11, he also explained to Attorney Gall the circumstances of his arrest on August 5, "but did not tell counsel that I was being imprisoneded [sic] illegally because I factually did not know of the illegality of my imprisonment until the following day when I submitted my first Inmate Request to Booking/Mrs. Boatwright." Plaintiff's affidavit at 120.

Plaintiff nonetheless contends Attorney Gall could not intercede into the matter of his August 5, 2008 arrest, even if he had known the circumstances were illegal, because Plaintiff was represented by a different attorney on the earlier charges, "and it would have been a violation of the Code of Ethics for Attorney Gall to represent my interest in 08-M-289, 669, when I was repersented

15

[sic] by Mr. Cox." Plaintiff's affidavit at 121.

Plaintiff and Attorney Gall proceeded to the courtroom and advised that Plaintiff wished to proceed to trial on the June 7 violations (Permitting DUI, Permitting unauthorized driver). Plaintiff's affidavit at 122.

Although the purpose of the August 11, 2008, was for revocation of bond based on the June 7 violations, Prosecuting Attorney Renee Burger called Defendant Dobbs to testify, and Magistrate Reed-Vanata heard Dobbs' testimony concerning the July 25 and August 5 alleged violations as well.[8]  Magistrate Twyman had already found probable cause that Plaintiff had violated his conditions on July 25.  Plaintiff's Ex. 8.

Dobbs testified that Plaintiff had been arrested and charged with DUI/1st offense by Officer Staley on July 25, 2008, and that violation was the reason he petitioned to have Plaintiff's home confinement revoked.  Dobbs further testified he had taken Defendant into custody on August 5, 2008, because he had "discovered [him] drinking alcohol."  Plaintiff's Ex. 7(a), 13, p 9, 10 11, 12.

Magistrate Reed-Vanata advised Plaintiff he had every right to go to trial on the June 7 charges, but "if he insisted on invoking that right she was going to revoke [his] bond based on Defendant Dobbs' testimony and allow [him] to select a jury in November and [he] would go to trial in February of 2009, which was eight months away or [he] could be smart and accept the 6-month sentence to run concurrent with [his] home confinement and have the Permitting Unauthorized Driver dismissed."  Plaintiff's affidavit at 125.

Plaintiff contends that "based upon the threat in the conversation with Marion County

---

[8]Significant to an understanding of this complex matter is the fact that on June 7, the date Plaintiff permitted DUI according to his own guilty plea, Plaintiff was not yet on home incarceration with electronic monitoring.

Magistrate Cathy Reed-Vanata [he] entered a guilty plea to the charge of Permitting DUI 2nd, Case No. 08-M-872."[9], [10]

Magistrate Reed-Vanata sentenced Plaintiff to 6 months to run concurrent with the home confinement sentences imposed on May 9, 2008 (case numbers 08M-289 and 669).

That same date (August 11, 2008) USPO Burlas contacted the jail and was advised that Plaintiff had been received on August 5, 2008, having been brought in by a Home Confinement officer. Plaintiff's affidavit at 129.

On August 12, 2008, Plaintiff submitted an Inmate Grievance to the Booking Department/Mrs. Boatwright regarding his initial hearing on charges from Marion County for which he was imprisoned. The request was forwarded to the Director of Inmate Services. Ex. 11 to amended complaint.

On August 15, Attorney Cox petitioned to withdraw as counsel due to the close of his office and start of new employment with the prosecutor's office, which petition was granted. Plaintiff's affidavit at 130.

On August 15, the Magistrate Court sent a Notice to Appear before Magistrate Pride-Linger on September 23, to Plaintiff at his home address. The Notice was for the final revocation hearing of Plaintiff's home confinement due to the July 25, arrest. Plaintiff's Ex 12.

That same date, Marion County Magistrate Pride-Linger entered a Transportation Order for Plaintiff to be transported from the North Central Regional Jail for the final revocation hearing. Plaintiff's affidavit at Ex. 14.

---

[9]Magistrate Reed-Vanata is not named as a party in this lawsuit.

[10]Plaintiff was subsequently found guilty of that charge by United States District Judge Irene Keeley.

On August 19, 2008, Officer Burlas filed a subsequent Petition alleging that on July 25, 2008, while on supervised release, Plaintiff was arrested by the Fairmont Police Department and charged with DUI and Driving on a Suspended License for a previous DUI conviction. Officer Burlas noted the charge alleged Plaintiff's BAC to be .135%. He advised that Plaintiff had been arrested, transported to the Police Station, processed and then released. Further, at the time of the incident, a known convicted felon was a passenger in Plaintiff's vehicle.

Officer Burlas further noted that, although Plaintiff was released on bond July 25, 2008, the police report advised this was due to the large number of calls at the police station that night. Defendant Dobbs, his home confinement officer, subsequently took him into custody for violation of his home confinement, including the facts of the above arrest, and the fact that Plaintiff had left his residence without permission. He was taken to the North Central Regional Jail on July 30, 2008, and released after posting bond on July 31, 2008.

Officer Burlas further included the charges that form the basis of Plaintiff's present Complaint, stating:

> On August 5, 2008, Mr. Horton was again taken into custody by the Marion County Home Confinement Office after being notified by local law enforcement that Mr. Horton had just been observed walking toward his home with a case of beer. North Central Regional Jail records reflect Mr. Horton was received on August 5, 2008 and, to date, he has not made bond. As of this writing, a final home confinement revocation hearing has not been heard.....

Officer Burlas included the following recommendation:

> Given Mr. Horton's significant history of non-compliant behavior, especially his alcohol consumption, and given that lesser sanctions, including inpatient substance abuse treatment and home confinement, have not deterred him from continuing his non-compliant behavior, it is respectfully recommended that Mr. Horton's term of supervised release be revoked.

U.S. v. Horton, 1:93cr40.

On August 20, 2008, United States District Judge Irene M. Keeley Ordered the issuance of a warrant with Plaintiff to be detained upon arrest.  Id. at Docket Entry 173.

An arrest warrant was issued that same date and lodged as a detainer, because Plaintiff was in State custody at the North Central Regional Jail.

On August 29, 2008, Plaintiff submitted a request to the booking department at the jail concerning the charges on which he was being held and the identity of the committing magistrate. Ex 14 amended complaint.

Mrs. Boatwright informed Plaintiff that his charges were home confinement violations, that Dobbs had signed the paperwork, that there was no bond, and that he also had a federal detainer Plaintiff's affidavit at 138, citing  Dobbs' interrogatory responses at 16 and 5.

On September 6, 2008, Plaintiff sent a grievance to Defendant Trent, stating that he had been informed he had been committed to the jail by Dobbs, and that on September 4, Officer Boatwright in booking confirmed that Dobbs  signed the commitment papers.  He advised Trent that Dobbs was not a judicial official and lacked judicial capacity to commit him to jail and the jail's staff should have never accepted his person  for imprisonment without a lawful order signed by a magistrate or circuit court judge.  He asked Trent to "secure [his] release immediately." Defendants' exhibit H. Defendant Trent responded as follows:

> You are being held on a Home Confinement Violation signed by the home confinement officer.  Also, you are being held on a Detainer from the United States Marshal Service.  You will need to take this up with your attorney or the Court.  You will be held until we receive a release for you.

On September 12, 2008, Plaintiff wrote to Defendant King, as an appeal from Trent's decision. He advised King that  Trent recognized he was being detained in jail by Dobbs for home

confinement violations, and stated correctly that Dobbs is a Lt. with the Marion County Sheriff's Department, and not a judicial official. He further stated Dobbs lacked the judicial capacity to detain him without a commitment order signed by a magistrate or judge. He stated that Trent was "fully aware that the commitment signed by Mr. Dobbs is not a lawful order issued/signed by a judicial official," and that Trent had "negligently failed to act when he had a duty to insure that I am not detained without a lawful order of a court to commit." He also stated that Trent breached his duty by failing to take the necessary steps to secure his release. He noted the federal detainer was not at issue, and concluded with "I want to be released." Exhibit I.

On September 22, 2008, King responded to Plaintiff's letter as follows:

> It appears that a check of your commitment orders requires the Regional Jail Authority to hold you in our custody until we receive court orders releasing you from our custody or sentencing you. You also have a US Marshal Service detainer that you must clear up. Therefore, your appeal is denied. I suggest that you might want to consider retaining private legal counsel to address this matter in the judicial system.

Ex. J.

On September 23, 2008, Plaintiff appeared before Magistrate Pride-Linger with attorney David Anderson for the final revocation hearing in Cases 289 and 669, based on Dobbs' July 30, 2008, Petition alleging violation of home incarceration on July 25, 2008. Plaintiff's affidavit at 150.

The State called Officer Hudson, then Dobbs. Dobbs testified to the content of Officer Staley's incident report and testified that based on that report he requested the warrant for arrest for violation of rules 1 and 5 of the home confinement agreement. Plaintiff's affidavit at 156.

Regarding the August 5 violation, Dobbs testified an informant had seen Plaintiff walking with a case of beer. Dobbs testified when he arrived at Plaintiff's residence an unknown black female let him in. Dobbs testified that Plaintiff was found in the bathroom, and he saw a bottle of

vodka and two bottles of beer on a living room table. Dobbs testified he committed Plaintiff to the North Central Regional Jail on August 5, 2008. Plaintiff's affidavit at 160.

Plaintiff testified he was not charged for the DUI/1st offense on July 25, 2008, nor did Officer Staley issue a citation for DUI. Ex. 7(a). Plaintiff testified he had been imprisoned in the jail since August 5, 2008, when Dobbs did not request an order or warrant, without an appearance before a magistrate and Dobbs committed him to the jail without lawful authority to do so.

Plaintiff alleges Magistrate Pride-Linger checked her computer for arraignments on August 5, 2008 or thereafter, which would show he had not been seen by any of the magistrates after that date.

Plaintiff alleges Magistrate Pride-Linger then asked the booking dept at the jail to fax the commitment order to her. Ex. 7, amended complaint.

Plaintiff claims Magistrate Pride-Linger then threw the Commitment and Release Form across the room and dismissed the alleged violation of home confinement as alleged by Dobbs and ordered his release from the jail. Plaintiff's affidavit at 166. Magistrate Pride-Linger did sign an order on September 23, 2008, dismissing Plaintiff's home confinement violation. Magistrate Pride-Linger states in her sworn affidavit that the jail did not have the responsibility of setting the hearing, but that it was and is the responsibility of the Magistrate or Circuit Court to set hearings. Defendants' Exhibit D.

On September 24, supervising United States Probation Officer Burlas received a call from Dobbs, reporting Plaintiff had had a hearing the day before and "he has served his time for violation in Marion County." Officer Burlas advised there was a detainer lodged against Plaintiff and the jail would need to contact the United States Marshal Service to serve it.

On September 24, 2008, Plaintiff appeared in Federal Court via video from the North Central Regional Jail for an Initial Appearance on the August 19, 2008, Petition. A Preliminary Hearing was originally scheduled for September 29, 2008, but later canceled upon review of the Order by the District Judge expressly ordering Plaintiff proceed straight to a final revocation hearing should he violate his home confinement or his supervised release conditions again. Final hearing was scheduled for October 22, 2008 (Docket Entry 182), but was later continued without objection until October 28, 2008 (Docket Entry 184). The hearing was again continued without objection until November 12, 2008 (Docket Entry 187).

On September 25, 2008, West Virginia Business College officially withdrew Plaintiff's enrollment due to non-attendance and he forfeited the total sum of $2804 in Title IV loans he had to repay for the summer quarter.

On September 30, 2008, Plaintiff filed a grievance appeal to Terry Miller, Executive Director West Virginia Regional Jail and Correctional Facility Authority "because Defendant King's response of September 22, 208, was a duplicate of Defendant Trent's response of September 8, 2008." Ex. 22 amended complaint.

On November 17, 2008, Plaintiff appeared before United States District Judge Keeley for final revocation on the Petition filed on May 8, 2008, which final revocation hearing had been held in abeyance pending his "successful completion" of his year of home confinement. Plaintiff admitted guilt to the violations of mandatory conditions for the arrests on May 4, and June 7, and Judge Keeley found Plaintiff guilty of violating Standard Condition 7 and 9, excessive use of alcohol and associating with a convicted felon, from the arrest on July 25. District Judge Keeley revoked Plaintiff's supervised release and sentenced him to 14 months imprisonment with credit for time

served from September 23, 2008 (Docket Entry 190).[11]

Plaintiff was released from federal custody on his revocation sentence on July 7, 2009. (U.S. v. Horton, 1:93cr40 Docket Entry 201.

## Defendants Dobbs and Benson

## Allegations in the Complaint/Amended Complaint

Plaintiff states his amended complaint against the above-named defendants is pursuant to 42 U.S.C. sections 1983 and 1985, "to redress the deprivation, under Color of Law (State Law) of rights secured by the Constitution of the United States." Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. sections 2201 and 2202. Plaintiff alleges in his complaint that Defendant Dobbs falsely imprisoned him and violated his Fourth and Fourteenth Amendment rights by conducting a warrantless arrest without probable cause and by failing to present or cause Plaintiff to be presented before a judicial official for a probable cause determination. Plaintiff alleges Defendant Benson, with the intent to imprison him, falsely imprisoned him in the North Central Regional Jail on the false and fraudulent commitment and release form signed by Lt. Dobbs with total disregard for the law and Plaintiff's constitutional rights whereas Plaintiff was imprisoned in the North Central Regional Jail without process issued by a judicial official until ordered released by the court on September 23, 2008.

Plaintiff's complaint expressly states that each of the above-named defendants is sued in his individual capacity and acted under color of law. Plaintiff demands declaratory judgment and $2,000,000.00 in compensatory damages and $2,000,000 in punitive damages from Defendant

---

[11]Plaintiff argues that had Defendant Trent released him to the detainer, he would have received credit for time served from August 19, 2008 instead of September 23, 2008 (a total of approximately 35 days). There is no dispute his actual federal sentence would have remained the same, except he would have received credit for the time served up until September 23.

Dobbs. Plaintiff demands declaratory judgment and $750,000.00 in compensatory damages and $1,000,000 in punitive damages from Defendant Benson. Plaintiff's Complaint, Docket Entry 1. Pursuant to the Conspiracy Cause of Action against all Defendants, Plaintiff demands Declaratory Judgment, compensatory damages of $2,000,000.00 jointly and severally against all defendants; and $3,000,000.00 against each defendant for punitive damages.

## Lt. Wesley Dobbs

Defendant Dobbs was at all times relevant to this litigation the time at issue, employed by the Marion County Sheriff's Department as the Home Incarceration Supervisor. (Defendant's Ex. 10). Defendant Dobbs is named individually in the First Cause of Action which alleges:

> Lt. Dobbs, and the Unknown Marion County Deputy Sheriff, willfully, deliberately, intentionally, and with malice in fact did violate Plaintiff's Fourth Amendment rights and did falsely imprison Plaintiff when they seized Plaintiff's person on August 5, 2008, in Plaintiff's residence, and did terminate Plaintiff's freedom of movement without Probable Cause, Reasonable Cause, an Order, Warrant, or Other legitimate means of pursuing Lt. Dobbs jobs related goals as Home Incarceration Supervisor. Lt. Dobbs and the Unknown Deputy knew or reasonably should have know that the seizure of Plaintiff's person without Probable Cause, Reasonable Cause, an Order, Warrant or Other legitimate means of pursuing Lt. Dobbs job related goals as Home Incarceration Supervisor would violate Plaintiff's Fourth Amendment right;

> Whereas, Lt. Dobbs did with malicious intent to falsely imprison Plaintiff in the North Central Regional Jail did with total disregard for the law and Plaintiff's Constitutional rights did deliberately, intentionally deny Plaintiff an initial appearance before a judicial official; and,

> Lt. Dobbs did intentionally and willfully sign a false and fraudulent Commitment and Release Form to falsely imprison Plaintiff in the North Central Regional Jail without lawful process issued by a judicial official and Lt. Dobbs knew or reasonably should have known that he was violating Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights and falsely imprisoning Plaintiff when Lt. Dobbs and the Unknown Deputy conducted a warrant-less arrest and failed to present or cause Plaintiff to be presented before a judicial official for a probable cause determination and Lt. Dobbs was the cause and the proximate cause of Plaintiff's false imprisonment in the North Central Regional jail from August 5, 2008 until released on September 23, 2008.

## Officer Clyde Benson

Defendant Benson is and was at all times relevant to this litigation a Marion County Transportation officer. (Defendant's Ex. 10). Defendant Benson is named individually in the Second Cause of Action which alleges:

> Officer Benson willfully, intentionally and deliberately did transport Plaintiff to the North Central Regional Jail pursuant to a False and Fraudulent Commitment and Release Form signed by Lt. Wesley Dobbs when Officer Benson, a Veteran Transport Officer of the Marion County Sheriff's Department knew or reasonably should have known (1) that Lt. Dobbs was not authorized by law to Commit or Release Home Incarceration participant's [sic] to or from the North Central Regional Jail, (2) the Commitment and Release Form was not fair on its face, that is process issued by a court, magistrate or body having legal authority to issue a proper commitment order, and commitment thereof would violate Plaintiff's Fourth and Fourteenth Amendment rights;

> Whereas, Officer Benson did with intent to imprison Plaintiff did falsely imprison Plaintiff in the North Central Regional Jail on the False and Fraudulent Commitment and Release From signed by Lt. Dobbs with total disregard for the law and Plaintiff's Constitutional rights whereas the Plaintiff was imprisoned in the North Central Regional Jail without process issued by a judicial official until ordered released by the court on September 23, 2009 [sic].

## Conspiracy (Dobbs and Benson)

In the Fifth Cause of Action, Plaintiff names Dobbs and Benson (along with co-defendants Kimball, Trent, and King), alleging a conspiracy among all the defendants knowingly, intentionally, willfully, wantonly, and recklessly, to combine, conspire, confederate and agree together with others known and unknown to Plaintiff to violate Plaintiff's rights and privileges guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution . . . . all in violation of 42 U.S.C. sections 1983 and 1985(3).

## Summary Judgment

Plaintiff and Defendants Dobbs and Benson have each moved for Summary Judgment

pursuant to Federal Rule of Civil Procedure 56, which provides as follows:

> (a) A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion . . . .

> (c)(1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. . . . .

> (3) The court need consider only the cited materials, but it may consider other materials in the record.

> (4) An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. . . . .

> (e) If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of facts as required by Rule 56(c), the court may:

>> (1) give an opportunity to properly support or address the fact;
>> (2) consider the fact undisputed for purposes of the motion;
>> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed - - show that the movant is entitled to it; or
>> (4) issue any other appropriate order.

The party seeking summary judgment bears the initial burden of showing the absence of any

genuine [disputes] of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick Conty Comm'rs, 945 F.2d 716 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The United States Supreme Court noted in Anderson, however, held: "Rule 56(c) provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979))(Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.") (Citing Stevens v. Howard D. Johnsons Co., 181 F.2d 390 (4th Cir. 1950)).

In Celotex, the Court stated that "the plain language of Rule 56(e) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary Judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 912 F.2d 73 (4th Cir. 1990), cert. denied, 502 US. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574 (1986).

The complaint in this case was filed in 2009, and there has been more than sufficient opportunity for discovery despite Plaintiff's pro se status and the fact that he was in federal custody until very recently. The Court granted a number of extensions for him to obtain discovery and file motions and responses.

This Court has carefully reviewed the parties' motions and related memoranda. The Court must take the facts alleged in the Complaint and Amended Complaint as true. See S.P. v. city of Takoma Park, 134 F.3d 260 (4th Cir. 1998). Further, because the plaintiff is pro se, this Court must liberally construed the plaintiff's pleadings. See Haines v. Kerner, 404 U.S. 519 (1971)(holding pro se complaint to less stringent standards than formal pleadings drafted by lawyers).[12]

### The Warrantless Arrest on August 5, 2008

There is no dispute that Plaintiff was placed on Home Confinement on June 9, 2008. There is no dispute that one of the conditions of his home incarceration was that he not consume or possess any alcohol. There is no dispute that Plaintiff signed four documents, including a document which begins:

> I do hereby release all my Fourth Amendment Rights, which protects [sic] individuals from unlawful searches and seizures, to Any Home Confinement Officers and/or others at the Home Confinement Officers direction.

There is no dispute that someone (according to Plaintiff probably a Fairmont Police Officer) informed Dobbs that Plaintiff was seen carrying a case of beer. Someone (either Dobbs or his office assistant) telephoned Plaintiff and told him to turn himself in to the Home Incarceration Office.

---

[12]Despite proceeding pro se, the undersigned feels compelled to note that Plaintiff has done an admirable job presenting his case, and except for his incarceration limiting his access at times, appears to have had no real disadvantage in prosecuting his case. He has also proceeded with proper decorum and respect for the procedures and the Court.

Dobbs states Plaintiff said he would be at the office by 1:00, while Plaintiff states he was given until 2:30 to appear. Even under Plaintiff's version of the events, however, he was to turn himself in to Dobbs at the office by 2:30. Yet Plaintiff himself swears he was in his residence when Dobbs and Alkire opened the door and came in at about 2:30. Under either version of the events, it was impossible for Plaintiff to be at Dobbs' office when he had said he would be there. Plaintiff himself concedes that the report to Dobbs that Plaintiff had beer was "reasonable suspicion" to believe he had violated his home incarceration rules and to search his residence. The undersigned finds that Plaintiff's not appearing at Dobbs' office by the time he said he would (even after being given the extra time he requested), was additional reasonable cause for Dobbs to arrest him. Further, Plaintiff admits signing the above-quoted waiver of his Fourth Amendment rights, which allowed Dobbs to enter his residence at any time.

West Virginia Code section 62-11B-7a provides:

> The county commission may employ one or more persons with the approval of the circuit court and who shall be subject to the supervision of the sheriff as a home incarceration supervisor or may designate the county sheriff to supervisee offenders ordered to undergo home incarceration and to administer the county's home incarceration program. Any person so supervising shall have authority, equivalent to that granted to a probation officer pursuant to section ten, article twelve of this chapter, to arrest a home incarceration participant when reasonable cause exists to believe that such participant has violated the conditions of his or her home incarceration.

Section 62-12-10, in turn, provides:

> If at any time during the period of probation there shall be reasonable cause to believe that the probation has violated any of the conditions of his probation, the probation officer may arrest him with or without an order or warrant, or the court which placed him on probation, or the judge thereof in vacation, may issue an order for his arrest, whereupon he shall be brought before the court, or the judge thereof in vacation, for a prompt and summary hearing . . . .

29

The undersigned finds that, pursuant to the above code sections, Dobbs could legally arrest Plaintiff without a warrant if he had reasonable cause to believe Plaintiff had violated any of the conditions of his home incarceration. The undersigned further finds that the report to Dobbs, in particular if it was from a law enforcement officer, as Plaintiff believes it was, that Plaintiff was carrying beer home, was reasonable cause to believe he had violated his conditions of home incarceration. Additionally, even if Plaintiff was given until 2:30 to present himself to the Home Incarceration Office, it is undisputed that he did not do so, as he states Dobbs and Alkire opened his door at 2:30. The fact that Plaintiff had not appeared as directed by Dobbs provides independent reasonable cause for his arrest for violating his conditions of Home Incarceration.

The undersigned United States Magistrate Judge therefore finds Dobbs had reasonable cause to arrest Plaintiff on August 5, and could do so without a warrant according to State law, and the document waiving his rights signed by Plaintiff.

## The Commitment and Release Order

Plaintiff alleges both Dobbs and Benson used the "False and Fraudulent" Commitment and Release Form to falsely imprison him. Significantly, when asked, Plaintiff could not provide any law that supports his position that the commitment and release form is non-compliant with federal or State law. (Defendant's exhibit F at 111). In fact, he testified that he did not believe there was any law regarding the form. Id. He stated only his "belief" the form was fraudulent "[b]ecause of everything it omits." Id at 112. No party has submitted any law or case law regarding whether the Commitment and Release Form is or is not a valid document for the committal of alleged home confinement violators. Nor could the undersigned find any mention of the form or any other version of the form.

Plaintiff has cited Rogers v. Albert, 208 W.Va. 473, 541 S.E.2d 563 (W.Va. 2000) in support

of his argument that the Commitment and Release Order is fraudulent, saying the case states: "It is

the law of West Virginia that no person my be imprisoned or incarcerated prior to presentment

before a judicial official and issuance of a proper commitment order." Defendant's Ex. F at 113.

Rogers expressly does not stand for that proposition, however. In fact, Rogers cites State ex rel.

Harper v. Zegeer, 296 S.E.2d 873 (1982) for that proposition, but then distinguishes it. In Rogers,

the plaintiff had relied on Harper, stating that "it effectively precludes any post-arrest delay not

occasioned by either transport or completion of the administrative steps incident to arrest." The

West Virginia Supreme Court of Appeals, however, held:

> Rather than prohibiting any detention prior to presentment before a magistrate, we
> interpret Harper as merely expressing the longstanding common-law rule that an
> arrestee may not be held in custody for an unreasonable period of time prior to being
> afforded an appearance before a neutral judicial officer. See Haney v. Town of
> Rainelle, 125 W.Va. 397, 404, 25 S.E.2d 207, 211 (1943)(after an arrest, "'the
> prisoner may be confined in the most suitable place, for a reasonable time, until it is
> possible for him to be taken before a magistrate.'")

Plaintiff has therefore submitted no evidence, and the undersigned could find none, in

support of his contention that the Commitment and Release Form is "False and Fraudulent." The

record contains a sworn affidavit from Magistrate Melissa Linger, submitted on behalf of co-

defendants Trent, Kimball, and King, stating:

> The North Central Regional Jail fulfilled its responsibility in detaining Mr. Horton
> as he was brought to North Central Regional Jail with a properly signed commitment
> and release form signed by a home confinement officer.

(Emphasis added). Those defendants further submitted a sworn affidavit from Defendant Trent,

stating:

> On September 26, 2008, I responded to Mr. Horton's September 25, 2008, inmate
> grievance after speaking with Marion County Magistrate Melissa Linger. Magistrate

> Linger informed me it was proper to detain Mr. Horton to the North Central Regional Jail as he was brought to North Central Regional Jail with a properly signed commitment and release form signed by a home confinement officer. . . . [and]

> This Commitment and Release form is a form commonly used by home confinement officers committing individuals to the North Central Regional Jail.

(Emphasis added). While the undersigned has already found Magistrate Linger's affidavit not admissible as proof the Commitment and Release Form on its face is Constitutionally sufficient, a review of these two affidavits show they are made on personal knowledge, show that the affiants are competent to testify on the matter, and do set out other facts that would be admissible in evidence, such as the sworn testimony that the form is commonly used by home confinement officers to commit individuals to the jail, and to show the fact that even judicial officers and jail administrators consider it a valid document, long-used, and not a "False and Fraudulent" document, as alleged by Plaintiff.

Plaintiff attached to his own Summary Judgment Motion and Response to Defendants' Summary Judgment Motion Defendant Dobbs' Answers to Interrogatories, in which Dobbs states twice:

> The Home Confinement Commitment and Release Form has been used by the home confinement program in Marion County since I began. The form has always been in the office. I do not know who provided the form.

(Plaintiff's Ex. A-13)

Also attached to Plaintiff's Motion and Response to Defendants' Motion was the Response to Interrogatories of Defendant Benson, who stated:

> The Commitment and Release Form is a form authorizing commitment until a preliminary hearing at a future date . . . . [and]

> Lt. Dobbs is authorized to place an individual who has violated a condition of his or her confinement in custody pending a preliminary hearing . . . . [and]

Home Confinement Supervisors may place individuals in custody at the Regional Jails. The length and duration of such custody is determined at a later time by a judicial officer.

(Plaintiff's Ex. A 15).

Plaintiff counters these sworn affidavits and responses by arguing that Defendant Benson, "to the very best of [his] knowledge and belief," as a Veteran Transport Officer, knew that the Commitment and Release Form was not valid on its face. He also argues that Defendant Dobbs signed the "False and Fraudulent Commitment and Release Form . . . as a means to lose me in the system." He admits, however, he does not have any evidence that the form is invalid, illegal, or unconstitutional.

First, as already found, West Virginia law does not stand for the proposition that a person cannot be imprisoned or incarcerated in a Regional Jail prior to presentment before a judicial official Rogers v. Albert, 208 W.Va. 473, 541 S.E.2d 563 (W.Va. 2000). In fact, as already stated, Rogers holds:

> Rather than prohibiting any detention prior to presentment before a magistrate, we interpret Harper as merely expressing the longstanding common-law rule that an arrestee may not be held in custody for an unreasonable period of time prior to being afforded an appearance before a neutral judicial officer.

Second, Plaintiff does not produce even a scintilla of evidence to support his "knowledge and belief" as stated above. His beliefs are not "specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Plaintiff here cites no judicial opinions, and we can find none, stating that it was unlawful for the Home Confinement Officer to arrest Plaintiff and commit him to the jail, or for the transport officer to transport Plaintiff to the jail, using the Commitment and Release Form in use for years,

stated by a Magistrate and the jail administration to be valid, and signed by the Home Confinement Officer.

Further, although Plaintiff, contends that Dobbs should have obtained a warrant "the old-fashioned lawful way," we decline to impose liability on these defendants based upon this argument. Accordingly, even if Plaintiff's Fourth Amendment rights in this particular context were cognizable, (and the undersigned is not convinced they were), these rights were not sufficiently clear at the time of Defendant's arrest to notify reasonable officers that the use of the Commitment and Release Form, acknowledged as legal by a magistrate judge, and in use for years, was unlawful, thus entitling them to qualified immunity on Plaintiff's Fourth Amendment claim.

The Fourth Circuit holds:

> Qualified immunity is an accommodation by the courts to the conflicting concerns of, on one hand, government officials seeking freedom from personal monetary liability and harassing litigation and, on the other hand, injured persons seeking redress for the abuse of official power. *Hodge v. Jones*, 31 F.3d 157 162 (4th Cir. 1994)(internal quotation marks omitted). To that end, qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 296 (1982). In determining whether a government official is entitled to qualified immunity, "we must (1) identify the constitutional right violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable offic[ial] would have understood that the conduct at issue violated the clearly established right." S.P. [v. City of Takoma Park], 134 F.3d at 265 [4th Cir. 1998].

Henderson v. Simms, et al., 223 F.3d 267 (4th Cir. 2000).

Based on the above, the undersigned does not find that Plaintiff's Constitutional Rights were violated through use of the Commitment and Release Form. Even if that form is found to be unconstitutional, however, the undersigned finds any constitutional right violated by the use of the

form was not clearly established at the time of Plaintiff's arrest.  Finally, both Dobbs and Benson would be entitled to qualified immunity for their use of the form because "a reasonable offic[ial] would not have understood that the conduct at issue violated the clearly established right." Henderson, supra.

## Due Process

Plaintiff also alleges his detention without a hearing for some 48 days violated his due process rights under the Fourteenth Amendment.  The Fourteenth Amendment provides that the State shall not "deprive any person of life, liberty, or property without due process of law."  In Henderson v. Simms, et al., 223 F.3d 267 (4th Cir. 2000) three re-incarcerated inmates also argued that  their reincarceration without a hearing to challenge the basis for the reincarceration violated their rights not to be deprived of liberty without due process of law under the Fourteenth Amendment.  The Fourth Circuit directed that  Due Process claims are examined in two steps: 1) whether there exists a liberty or property interest which has been interfered with by the State; and 2) whether the procedures attendant upon that deprivation were constitutionally sufficient.  Id. at 274.  The United States Supreme Court had already  found that the requirements of procedural due process applied to parole revocations.  Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct.2593, 33 L.Ed.2d 484 (1972). The Supreme Court then held that due process required a preliminary hearing at the time of a parolee's arrest and detention "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions, . . . .and a revocation hearing prior to the final decision on revocation and within a reasonable time after the parolee is taken into custody in which the parolee has 'an opportunity to be heard and to show, if he can, that he did not violate the parole conditions, or if he did, that

circumstances in mitigation suggest that the violation does not warrant revocation.'" Id. at 488.

The Fourth Circuit extended the two-hearing requirement in Morrissey to revocation of supervised release, and revocation of pardon. See Pope v. Chew, 521 F.2d 400 (4th Cir. 1975), and U.S. v. Copley, 978 F.2d 829 (4th Cir. 1992). Plaintiff's case is more complicated, however. The Court could find no Fourth Circuit case, and, indeed, no federal case directly on point. The closest case the undersigned could find was a 2003 Seventh Circuit case, in which the court found that removal of a probationer from a home detention program into a jail was classified as a deprivation of liberty under the due process clause (See Paige v. Hudson, 341 F.3d 642 (7th Cir. 2003)). That is not precisely the case here, as Plaintiff was convicted, sentenced to imprisonment, then sentence suspended and home incarceration imposed in its place; was arrested again and had a probable cause hearing in which probable cause he violated was found; and was in between his probable cause hearing and final revocation hearing and was on bond when he was again arrested. No party has cited, and the undersigned could not find a Fourth Circuit case (or, in fact, any case in any jurisdiction) which answers the following question: What is the liberty interest where a person was convicted of a crime; was sentenced to 12 months imprisonment which was converted to home incarceration with electronic monitoring; where the convicted person waived all his Fourth Amendment rights in writing  in order to obtain home confinement as opposed to incarceration; where that person was subsequently arrested for a home confinement violation and had a probable cause hearing in which probable cause was found that he had violated his home incarceration; was released on bail pending a final revocation hearing; and was then arrested again, prior to his second, final revocation hearing, for allegedly violating both his home incarceration and his bond conditions?

Assuming, *arguendo*, that Plaintiff did have a liberty interest, were the  procedures attendant

upon that deprivation constitutionally sufficient? The Supreme Court in Morrissey held that due process required a preliminary hearing at the time of a parolee's arrest and detention "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions, . . . .and a revocation hearing prior to the final decision on revocation and within a reasonable time after the parolee is taken into custody in which the parolee has 'an opportunity to be heard and to show, if he can, that he did not violate the parole conditions, or if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.'" Id. at 488. The Fourth Circuit extended the two-hearing requirement in Morrissey to revocation of supervised release, and revocation of pardon. See Pope v. Chew, 521 F.2d 400 (4th Cir. 1975), and U.S. v. Copley, 978 F.2d 829 (4th Cir. 1992).

Assuming, *arguendo*, the Fourth Circuit would find Plaintiff had the same liberty interest as a person on supervised release, parole, or pardon, he would have had the right to a "prompt" preliminary hearing to determine whether there was probable cause or reasonable cause  to believe he committed acts that would constitute a violation of home incarceration, . . . .and a revocation hearing prior to the final decision on revocation and within a reasonable time after he was  taken into custody in which  he would have an opportunity to be heard and to show, if he could, that he did not violate the home incarceration or bond conditions, or if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.

There is no dispute that Plaintiff had no prompt preliminary hearing.  He was arrested at approximately 2:30 p.m., taken to the jail at approximately 5:00 p.m., and was not seen by any magistrate judge after his arrest until 5 days later (and that appearance was in a different case).  Even that amount of time is presumptively unreasonable under County of Riverside v. McLaughlin, 500

U.S. 44, 111 S.Ct. 1661 (1991). In <u>McLaughlin</u>, the Supreme Court held that " a jurisdiction that provides judicial determines of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of <u>Gerstein</u>. For this reason, such jurisdictions will be immune from systemic challenges. Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance.

If Plaintiff was entitled to a preliminary hearing within 48 hours, he did not receive one. Further, there was no evidence of a bona fide emergency or other extraordinary circumstance. Therefore, the undersigned would necessarily find his due process rights were violated. There still remains the question, however, of whether either Dobbs or Benson or both violated his constitutional rights.

Rule 1(b) of the Administrative Rules for the Magistrate Courts of West Virginia provides:

One magistrate in each county, on a rotating basis, shall be on call at all times other than regular office hours. On-call duties shall extend, in criminal cases, to initial appearances; to taking bond for someone who is in jail; and to receiving and acting upon emergency search warrants, domestic violence matters, and juvenile abuse and neglect matters.

(1) Initial Appearances and taking Bond in Criminal Cases. Within the time periods provided for below, the on-call magistrate shall contact the county or regional jail, whichever applies, and the juvenile detention facility that serves the county, and shall inquire whether any person has been arrested in the county since the close of regular business hours or since the last contact with the jail, or whether anyone confined to the jail is able to post bond. If an arrest has been made or if a prisoner is able to post bond, the magistrate shall proceed immediately to the magistrate court offices to conduct an initial appearance and to set bail for such person, or to accept bond for someone already in jail.

It shall be sufficient to comply with this rule if the on-call magistrate contacts the jail and juvenile detention facility:

(A) Between 10:00 p.m. and 11:00 p.m. Monday through Friday . . . .

It appears to the undersigned, as Plaintiff argues, that Dobbs should have taken him directly to the magistrate instead of sending him to the jail since a magistrate should have been available. Dobbs himself states in his affidavit: "As it was past the end of my shift for the day, I went home." (Dobbs affidavit at 21). Yet Plaintiff did not get to the jail until 5:15 pm, so logically the magistrate court should still have been open at the time Dobbs sent Plaintiff to the jail. While Dobbs may not have followed proper procedure under West Virginia law, the undersigned does not find this a violation of Plaintiff's Due Process rights under the United States Constitution. Dobbs signed what the undersigned has already found to be a Commitment and Release Order deemed valid by a State magistrate and in use for many years. He gave that order to Benson, whose job it was simply to transport Plaintiff to the jail.

The Booking Data Sheet for the jail gives the date, the time, the arresting agency and the arresting officer and the transporting officer (Defendants' Ex. 12). Therefore when the Magistrate Office called in that night it should have been informed of Plaintiff's arrest and arranged a hearing.

Further, in his sworn affidavit, Dobbs states that early in the morning the day after he arrested Plaintiff, he called the Marion County Magistrate Court and notified them [sic] of Mr. Horton's arrest and detention at the Regional Jail. (Dobbs Affidavit at 22). This statement is unrefuted. The statement is also corroborated by the fact that a Notice of Hearing for August 13 (case no. 669) was sent to Plaintiff's residence on August 5, but then a transportation order was sent to the jail on August 6, for Plaintiff's transport to the magistrate court for the August 11th hearing (case 871-872.) The unrefuted evidence therefore shows that the magistrate court was made aware of Plaintiff's arrest and commitment to the jail on or before August 6, within 24 hours of his arrest.

As Marion County Magistrate Linger stated in her sworn affidavit:

> [I]t was and is the responsibility of the Magistrate Court or the Circuit Court to set a time for hearings.

Further...

> If a Defendant has appointed counsel, it is counsel's duty to seek release of the Defendant.

In fact, Plaintiff was transported from the jail to the Magistrate Court on August 11, pursuant to the transport order signed August 6. Significantly, that case was for the revocation of Defendant's bond in cases 871 and 872. The magistrate assigned to that case, Cathy Reed-Vanata, granted the prosecutor's motion for revocation on August 4, by writing: "Will hear on 8/11/08 at 1:00 p.m." It was then Magistrate Reed-Vanata who signed the transport order on August 6, thereby confirming the Magistrate Court was aware Plaintiff was incarcerated in the NCRJ by August 6, the day after his arrest.

At the hearing on August 11, Plaintiff did appear, as he was transported from the jail. He had appointed counsel, Conrad Gall. Attorney Gall advised Plaintiff that the State was offering him a plea of guilty to permitting DUI 2nd in exchange for a six (6) month sentence to run concurrent with his 12-month home-incarceration sentence. Plaintiff advised his counsel that he was innocent of the charge and wanted to go to trial. Plaintiff states in his affidavit:

> I briefly explained to counsel the circumstances of my arrest on August 5, 2008, but I did not tell counsel that I was being imprisonded [sic] illegally because I factually did not know of the illegality of my imprisonment until the following day when I submitted by first Inmate Request to Booking/Mrs.Boatwright . . . . Attorney Gall could not intercede into matters of my August 5, 2008, arrest even if he knew of the circumstances surrounding my arrest because I was represented [sic] by Attorney Keith Cox who I was unable to contact and it would have been a violation of the Code of Ethics for Attorney Gall to repersent [sic] my interest in 08-M-289, 669, when I was repersented [sic] by Mr. Cox.

Affidavit at 120-121.

Defendant Dobbs was called to the stand on August 11 (case 871-872) to testify concerning that arrest by officer Staley on July 25. Dobbs further testified that he had taken Plaintiff into custody on August 5, 2008, because he had discovered him drinking alcohol. <u>Plaintiff's affidavit at 124</u>.

Magistrate Reed-Vanata advised Plaintiff he had every right to go to trial but if he insisted on invoking that right she would revoke his bond "based upon Defendant Dobbs testimony" and allow him to select a jury in November. He would then go to trial in February, 8 months away, or "could be smart and accept the 6-month sentence to run concurrent with [his] home confinement and have the Permitting Unauthorized Driver dismissed . . . . <u>Id.</u>

"Based upon the threat in the conversation with Marion County Magistrate Cathy Reed-Vanata I entered a guilty plea to the charge of Permitting DUI 2nd," case No. 08-M-872. <u>Id.</u>

The undersigned finds it irrefutable that the Marion County Magistrate Court was aware of Plaintiff's arrest and incarceration on August 5 on or before August 6.

During Plaintiff's deposition he told Defendants' attorneys that three things were addressed on August 11 (the date for which the transportation order was sent to the jail)– 1) whether he wanted to plead guilty to the June 7 Permitting DUI case; 2) The bond revocation issue; and 3) the arrest for violation of home incarceration on August 5 (Ex. F at 50-52.) Plaintiff also told the attorneys at his deposition that he had counsel, Mr. Gall, during this hearing. When asked if Attorney Gall raised the August 5th arrest issue at all during the hearing, Plaintiff responded: "No, he didn't do nothing." Plaintiff was then asked if he, himself said anything about that at the hearing, to which he replied: "No, his thing was to get me to plead guilty." <u>Id.</u> at 53. When asked if he wanted

Attorney Gall to raise the issue of his August 5th arrest and detention, Plaintiff merely responded: "I – I wanted to go to trial, but when the magistrate gave me the choice that she gave me, I didn't have no choice but to plead guilty." Id.

The undersigned notes there would have been no reason for the Magistrate Court to hear Dobbs' testimony regarding the August 5 arrest if, as Plaintiff alleges, the Magistrate Court was kept unaware of the arrest and incarceration. If the Magistrate did not know of the arrest by August 6, she undisputably knew about it on August 11, and yet still did not have Plaintiff released from jail.

The undersigned therefore finds that even if Plaintiff was entitled to an initial proceeding within 48 hours of his arrest, his rights to that proceeding was not violated by either Dobbs or Benson, but by others.

## Qualified Immunity

The Fourth Circuit holds:

> Qualified immunity is an accommodation by the courts to the conflicting concerns of, on one hand, government officials seeking freedom from personal monetary liability and harassing litigation and, on the other hand, injured persons seeking redress for the abuse of official power. *Hodge v. Jones*, 31 F.3d 157 162 (4th Cir. 1994)(internal quotation marks omitted). To that end, qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 296 (1982). In determining whether a government official is entitled to qualified immunity, "we must (1) identify the constitutional right violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable offic[ial] would have understood that the conduct at issue violated the clearly established right." *S.P. [v. City of Takoma Park]*, 134 F.3d at 265 [4th Cir. 1998].

Henderson v. Simms, et al., 223 F.3d 267 (4th Cir. 2000). Henderson involved as defendants the Secretary of the Maryland Department of Public Safety and Correctional Services, the Commissioner

of the Maryland Division of Correction, and the Warden of the Maryland Reception, Diagnostic and Classification Center. The plaintiffs were three individuals who had apparently served their respective criminal sentences and were released from incarceration on "mandatory supervision," a release status similar to parole. In 1998, years after the prisoners were released, the Maryland Court of Appeals decided a case involving the interpretation of the statutes governing calculation of sentences. The three defendants in the civil case, none of whom were judicial officers, interpreted the case themselves and recalculated the three former prisoners' sentences themselves, ordering their release dates recalculated, which then fell far into the future.

The jail administrators then, without judicial action or warrant, arrested and reincarcerated the three plaintiffs. Because there was no statute to use to issue warrants under those circumstances, the Warden (not a judicial officer) himself issued warrants entitled "Retake Warrant for Arrest and Detention of Escaped Prisoner," despite having actual knowledge none of the prisoners had, in fact, escaped, that they were all released lawfully, and that they had, themselves, done nothing wrong. The warden then directed and caused armed police officers to arrest each plaintiff at his home or place or work and had each incarcerated. The plaintiffs were not afforded a hearing either pre-arrest or post-arrest to challenge the basis or legitimacy of their arrests or incarceration. Each filed a writ of habeas corpus and each was released. The Court of Appeals of Maryland found that the three jail administrators had misinterpreted the case upon which they relied to arrest the plaintiffs. In other words, the Court found the jail administrators were totally wrong in their interpretation of the case, were totally wrong in arresting the plaintiffs, and were totally wrong in incarcerating them on those warrants. The plaintiffs had wrongfully been incarcerated up to 19 days each.

As does Plaintiff here, the <u>Henderson</u> plaintiffs filed suit for damages, alleging their Fourth

and Fourteenth Amendment rights were violated by their arrest and detention without probable cause and without a hearing. The district court granted the jail administrators' motions to dismiss based on qualified immunity.

On appeal, the Fourth Circuit found the appellants had been "seized" within the meaning of the Fourth Amendment when arrested. The Court then cited a 1926 Maryland case, in which a prisoner became ill and was released for treatment at a sanatorium. When he then refused to return to jail, the Court held that "where a prisoner secures his liberty through some illegal or void order, it is to be treated as an escape, and he can be retaken and compelled to serve out his sentence." See Hopkins v. North, 151 Md. 553 (1926). Despite the fact that the Henderson plaintiffs did not even know they were supposed to be in prison, the Fourth Circuit held that the 74-year-old Hopkins case supported the position that no violation of the appellants' Fourth Amendment rights occurred when they were arrested and re-incarcerated as escapees. This despite the undisputed fact that the appellees were well aware that the plaintiffs had not escaped, had not done anything illegal, and in fact, the appellees had misinterpreted the case law.

More significantly, the Fourth Circuit held that, even assuming that the arrest of the former inmates did violate their Fourth Amendment rights, the court was "convinced" that the rights were not clearly established at the time of the seizures. Certainly the right to be arrested only on probable cause was clearly established at the time. See Smith v. Reddy, 101 F.3d 351 (4th Cir. 1996); however: "If the test of clearly established law is applied at this level of generality, however, plaintiff alleging a Fourth Amendment violation could 'convert the rule of qualified immunity . . . into a rule of virtually unqualified liability.'" Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Fourth Circuit held that the appellants must therefore allege facts

"demonstrating that the established contours of probable cause were sufficiently clear at the time of the seizure such that the unlawfulness of [Appellees'] actions would have been apparent to reasonable offic[ials]." In other words, the appropriate question is whether a reasonable official could have believed that issuing escapee retake warrants for the arrests and reincarceration of persons who had not escaped, but had instead been released on mandatory supervision was lawful, in light of clearly established law and the information Appellees possessed. Id. at 273.

The Fourth Circuit then held:

Applying these principles to this case, it was clearly not unreasonable for a Maryland State official in May 1998 to have believed that executing and issuing retake warrants pursuant to section 682(d) for the arrests and reincarceration of individuals they reasonably believed to have been erroneously released was lawful . . . .

Appellants cite no judicial opinions, and we can find none, stating that it is unlawful to use an escapee warrant to arrest and reincarcerate erroneously released prisoners . . . . Although Appellants contend that Appellees could have obtained the warrants "the old-fashioned lawful way," we decline to impose liability on Appellees based upon their failure successfully to predict the course of the law. Accordingly, even if Appellants' Fourth Amendment right in this particular context were cognizable, these rights were not sufficiently clear at the time of Appellants' arrests to notify reasonable state officials in Appellees' position that their conduct was unlawful, thus entitling Appellees to qualified immunity on Appellants' Fourth Amendment claim.

In the case at bar, West Virginia law clearly establishes that a "home incarceration supervisor" "shall have the authority, equivalent to that granted to a probation officer pursuant to [62-12-10], to arrest a home incarceration participant when reasonable cause exists to believe that such participant has violated the conditions of his or her home incarceration." Section 62-12-10, in turn, allows a probation officer to arrest a probationer at any time with or without a warrant , if there is reasonable cause to believe he has violated any of his conditions of probation. The undersigned has further already found that, even if the Commitment and Release Order were held to be unconstitutional, Plaintiff's rights were not sufficiently clear at the time of his arrest to notify

reasonable officers in Defendants' positions in August 2008, that their conduct was unlawful.

As regards Officer Benson, during Plaintiff's sworn deposition he was asked:

Q:      Why did you - - what made you want to sue Claude Benson?

A:      Because he was the transportation officer.

Q:      Okay.  Do you think that his job that day was anything more than just a bus driver?

A:      He could still be wrong.

Q:      What do you - - what do you think he should have done different?

A:      Well, you know, from talking – well, when I  was down there, from talking to several of the
        guards that work down there - -

Q:      Down where?

A:      The Marion County transit facility.

Q:      Okay.

A:      They all talk about Lieutenant Dobbs signing that commitment and release form . . . .

Q:      Ok.  So I think the question I asked, though, was what - - what do you think Claude Benson
        should have done different?

A:      He knows.  I mean, what I'm saying is this.  If you know that you're putting a man in jail
        illegally, you're supposed to do something about it.  You have - - I believe everybody that
        works in corrections, they have a [sic] affirmative duty not only to me, but to the state as
        well.

Q:      Okay.  So I don't want to put words in your mouth, so if you disagree with what I'm saying
        I just want you to – to correct me.  But, basically, the idea is that Claude Benson should have
        made a determination when Lieutenant Dobbs gave him the paperwork to transport you to

jail, Claude Benson should have said - - what should he have done?

A: That's in theory, okay?

Q: Okay.

A: But Mr. Benson had been working at - - at the - - for the Marion County Sheriff's Department for several years. Lieutenant Dobbs says that he been using the commitment and release form since 2000. Now, between 2002, when he first got hired, and 2008, somebody should have done something about him signing that commitment and release form and - - and transporting people up to the North Central Regional Jail.

Q: Okay. So you think the transportation officer signed the Marion County Sheriff's Department - -

A: He may not - - he may not should have done something that particular day, but he should at some point, had went and spoke with the sheriff or somebody else that was in authority about that commitment and release form. [Sic].

Q: So he should have been aware that - -

A: It was illegal.

Q: All Right. And then - - so a policeman comes in and says, "He, transport this guy to jail," and, I mean, should he say, "No, I won't do it?"

A: No. He's got the – he–he's – Lieutenant Dobbs is his superior. So he got to follow the orders that he gets.

Q: So then I guess that leads to my ultimate question: Is by Lieutenant Dobbs giving him the paperwork and him saying, "Okay. I'm going to just transport this guy to jail," I mean how – how - -- what did he do that was wrong in that situation?

47

A:      It was still his intent to cause me to be in prison.

Affidavit at p. 45-48.

Upon consideration of all of the above, the undersigned finds that, even if Plaintiff had a right to another initial proceeding, that right was also not sufficiently clear at the time of his arrest to notify the officers their conduct was unlawful. Finally, even if Plaintiff was entitled to that hearing and was unlawfully denied that hearing, the fault did not lay with Defendants who notified the Court in time that Defendant could have had such appearance within the Constitutionally-mandated 48 hours.

### Civil Conspiracy

To establish a civil conspiracy under section 1983, Plaintiff must present evidence that Defendants (and possibly co-defendants King, Kimball, and Trent) acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Plaintiff's deprivation of a constitutional right. See Hafner v. Brown, 983 F.2d 570 (4th Cir. 1992).

Defendant Trent states in his sworn affidavit that responding to Plaintiff's grievance did not require any communication and/or interaction with Defendant Kimball; that any communication he did have with Kimball did not involve any discussion of Plaintiff; that he did not communicate and/or interact with co-defendant Dobbs; that he did not communicate and/or interact with co-defendant Benson; that, in fact, he had never met Dobbs or Benson; that he did communicate with Magistrate Linger regarding the propriety of detaining Plaintiff based on the commitment and release form; and that he did communicate with Defendant King about the content of Plaintiff's grievances, but at no time communicated or discussed any type of conspiracy against any inmate, including Plaintiff.

Defendant King, in his sworn affidavit, states he did not recall ever meeting, communicating, and/or interacting with Defendant Dobbs, Defendant Benson, or Defendant Kimball; and that he did communicate with Trent regarding Plaintiff's grievance appeals to him; but that at no time during any communication or interaction with Trent did they discuss any type of conspiracy against any inmate, including Plaintiff.

Defendant Kimball, in her sworn affidavit, states that she has on prior occasions communicated with Defendant Benson, as he is a transportation officer who brings individuals to the jail; that she received and reviewed documents provided by Benson regarding Plaintiff; but that at no time did she and Benson speak, communicate, or in any way discuss any type of conspiracy against any inmate including Plaintiff; that as an employee of the jail she did occasionally interact with Defendant Trent; but that at no time during any interaction with Trent did they speak, communicate or in any way discuss Plaintiff, or any type of conspiracy against any inmate including Plaintiff; and that she has never met, communicated, or interacted with Defendant King.

Magistrate Linger also provided a sworn affidavit that the jail did not have the responsibility of setting a hearing for Plaintiff–rather, it was the responsibility of the court to set a hearing; that the jail detained Plaintiff on a "properly signed commitment and release form signed by a home confinement officer;" that it is the responsibility of the jail to detain an individual until it receives an order releasing the individual, which must be signed by a judicial officer; that if Defendant has counsel [and Plaintiff did have counsel appointed] it is counsel's duty to seek release of a defendant; and that it is not the responsibility of the jail to seek the release of individuals from its facilities.

Plaintiff argues that he has "proven" that here was a single plan, "to imprison Plaintiff, the essential nature and general scope of which was known to each person who is to be held responsible

for the consequences.  Plaintiff's Motion for Summary Judgment at 25.  The undersigned disagrees

with the inferences Plaintiff asks this court to draw.  Plaintiff has a weighty burden to establish a

civil rights conspiracy.  While he need not produce direct evidence of a meeting of the minds, he

must come forward with specific circumstantial evidence that each member of the alleged conspiracy

shared the same conspiratorial objective.  See Hafner v. Brown, 983 F.2d at 675-577; Abercrombie

v. City of Catoosa, Ok., 896 F.2d 1228 (9th Cir. 1990); Fonda v. Gray, 707 F.2d 435 (9th Cir. 1983).

In other words, to survive a properly supported summary judgment motion, Plaintiff's evidence

must, at least, reasonably lead to the inference that Defendants positively or tacitly came to a mutual

understanding to try to accomplish a common and unlawful plan.

Plaintiff's evidence fails in this regard.  Plaintiff did not produce any evidence, either direct

or circumstantial, that Defendants acted in concert to keep him detained unlawfully.  Nor does

Plaintiff's evidence give rise to an inference that each alleged conspirator shared the same

conspiratorial objective.  "The problem with [Plaintiff's] evidence is not merely that each act alleged

is capable of an innocent interpretation.  Rather, the problem is that [Plaintiff's] evidence amounts

to nothing more than rank speculation and conjecture.  It does not reveal that any member of this

alleged conspiracy possessed an intent to commit an unlawful objective."  See Hinkle v. City of

Clarksburg, W.Va., 81 F.3d 416 (4th Cir. 1996).

When asked in his deposition if he ever saw Kimball interact with Benson, Plaintiff replied

he had not.  He also did not witness or have any evidence that Kimball had any interaction with Lt.

Dobbs.  He had no evidence that Kimball had any interaction with Trent, except that "Mr. Trent had

to speak with the booking clerk concerning Roy Horton when he answered my grievance on

September the 8th when he advised me that I was being detained on a home confinement violation

signed by the home confinement officer." Ex. F. At 94. When asked why Trent must have spoken with Kimball, Plaintiff answered: "How else was he going to find out?" When asked whether Trent could have obtained the information from the commitment and release form or data sheet, Plaintiff responded," I will assume that he did that, but I don't know for sure." Id. The following colloquy then took place:

Q: So in terms of direct knowledge that Mr. Trent discussed or had some type of agreement with Brenda Kimball in this particular matter, you have no direct knowledge?

A: No.

Q: You're assuming that there was some type of interaction between them to obtain - - for him to respond to your grievances?

A; I am basing it upon the grievances that Mr. Trent signed.

Q: Ok. Okay. That he had some contact with Ms. Kimball?

A. Yes.

Q. Okay. And to the extent that - - and what I want to ask you is in the sense you've already told me that you don't believe - - you don't have any evidence that there was any communication or interaction between Ms. Kimball and Mr. Benson and Mr. Dobbs, you don't have any evidence that there was a conspiracy there. Direct - - direct - -

A. Evidence.

Q Evidence?

A. No, I do not.

Q. . . . . There's nothing that you can point me to directly to show that there was some type of an agreement or some type of a cohesive plan for Benson, Dobbs, and Kimball to commit

you and violate your constitutional rights?

A.    In answering that I'll answer that this was: With the 20 – what is it? – 24, 25 documents that I have submitted with the complaint and incorporated into the record, it establishes a pattern, okay?  One right after the other just like dominoes; they work in coherent - - they are coherent with one another.

Q.    Okay.

A.    And that is enough to establish a conspiracy.

Q.    Okay.  And that - - and just so I'm clear, that is your basis for your conspiracy?

A.    Yes, because the ultimate objective of it was to incarcerate Roy Horton.

Q.    Okay.

A.    And every one of them participated in incarcerating Roy Horton and keeping Roy Horton incarcerated in the North Central Regional Jail.

Q.    Okay.  And as it relates to - - and let me - - and this maybe - - saves us some questions - - as it relates to Mr. King and Mr. Trent, is that the same basis for your belief that they're involved in this conspiracy - - the paper trail that you reference?

A.    What it is - - their communication with one another - - it establishes one thing: To keep Roy Horton incarcerated.

Q.    And that is based on the documents you have, correct?

A.    Yes.

Q.    You don't have any other - - what I'm trying to make sure is that I understand exactly what evidence you have to support your claims.  And you're supporting - - what you reference as supporting your claims are the documents you've attached to your - -

A.     Yes, sir.

Q.     To you complaint and to the discovery, correct?

A.     Yes.

Id. at page 94-97.

> While we recognize that direct evidence of a conspiracy is not always available, we cannot use this fact as an excuse to forgive Plaintiff's failure to prove his case. There is a reason why we do not allow this level of conjecture to determine lawsuits: Such adventures of the mind tend to be unreliable. Appellants' conspiracy claim was ripe for an adverse summary judgment determination; it was based upon a theory without proof. [Plaintiff's] circumstantial evidence was probative of a conspiracy only through speculation and the piling of inferences; hence, the district court properly dismissed this claim.

Hinkle v. City of Clarksburg, WV, 81 F.3d 416, 423 (4th Cir. 1996).

Because the undersigned finds Plaintiff has not met his burden of proving a conspiracy under section 1983, among any two (or more) of the defendants, it follows that he also cannot prove a conspiracy to interfere with his civil rights under section 1985(3), which requires in addition that the co-conspirators were motivated by a specific class-based, invidiously discriminatory animus. In fact, Plaintiff has not shown any discriminatory basis for any of the acts or omissions by any of the defendants, much less a conspiracy.

**State Law Claims.**

As for Plaintiff's state law claims, federal courts may hear and decide state law claims in conjunction with federal law claims through the exercise of "supplemental jurisdiction." Wisconsin Dept. Of Corrections v. Schacht, 524 U.S. 381, 188 S.Ct.2047, 141 L.Ed.2d 364 (1998). Even if the pleadings in this case do state claims based on state law, the Court should decline to consider the state law claims alone. Federal courts are permitted to decline supplemental jurisdiction pursuant to

subsection 28 U.S.C. § 1367(c), if the district court has dismissed all claims over which it has original jurisdiction. Because the complaint fails to state a claim upon which relief may be granted under § 1983 or 1985, this matter should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and this Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims under § 1367(c)(3).

## Conclusion

For all the reasons herein stated, the undersigned United States Magistrate Judge finds there are no genuine disputes of material fact in this matter, and that Plaintiff has failed to overcome Defendants' Motion for Summary Judgment.

## RECOMMENDATION

For the reasons herein stated, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** "Defendants Lt. Wesley Dobbs and Claude Benson's Motion for Summary Judgment" [Docket Entry 181] be **GRANTED**; Plaintiff's Motion for Summary Judgment Against Dobbs and Benson [Docket Entry 201] be **DENIED** and this action be **DISMISSED with prejudice** as to these defendants.

Any party may, within fourteen (14) calendar days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th

Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985);

Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk for the United States District Court for the Northern District of West Virginia is directed to provide a copy of this Report and Recommendation/Opinion to counsel of record and by Certified Mail, Return Receipt Requested, to Plaintiff *pro se*.

Respectfully submitted this // day of July, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE